Filed 6/30/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

      Plaintiff and Respondent,

      v.

MARCOS ARTURO SANCHEZ,

      Defendant and Appellant.

S216681

Ct.App. 4/3 G047666

Orange County
Super. Ct. No. 11CF2839

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held, with exceptions not relevant here, that the admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses. Here we consider the degree to which the *Crawford* rule limits an expert witness from relating case-specific hearsay content in explaining the basis for his opinion. In addition, we clarify the proper application of Evidence Code sections 801 and 802, relating to the scope of expert testimony.

We hold that the case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law. They were recited by the expert, who presented them as true statements of fact, without the requisite independent proof. Some of those hearsay statements were also testimonial and therefore should have been excluded under *Crawford*. The error was not harmless beyond a reasonable doubt. Accordingly, we reverse the jury findings on the street gang enhancements.

1

## I. FACTS

On October 16, 2011, two uniformed Santa Ana police officers made eye contact with defendant Marcos Arturo Sanchez, who was standing nearby. He reached into an electrical box with one hand, then ran upstairs into an apartment while holding his other hand near his waistband. When told defendant did not live in the apartment, the officers entered and apprehended him. A boy who had been in the apartment testified the man arrested was a stranger who ran through the residence and into the bathroom. A loaded gun and a plastic baggie were found on a tarp several feet below the bathroom window. The items appeared to have been recently deposited. The downstairs neighbor, who owned the tarp, testified the items were not his and he had given no one permission to place them there. The baggie contained 14 bindles of heroin and four baggies of methamphetamine, all packaged for sale. Sanchez was charged with possession of a firearm by a felon, possession of drugs while armed with a loaded firearm, active participation in the "Delhi" street gang, and commission of a felony for the benefit of the Delhi gang.[1] He was also alleged to have been convicted of a felony for which he had served a state prison sentence.[2]

Santa Ana Police Detective David Stow testified for the prosecution as a gang expert. He had been a gang suppression officer for 17 of his 24 years on the force. His experience included investigating gang-related crime; interacting with gang members, as well as their relatives; and talking to other community members who may have information about gangs and their impact on the areas where they

---

[1] Former Penal Code section 12021, subdivision (a)(1) (now § 29800, subd. (a)(1)), Health and Safety Code section 11370.1, subdivision (a), and Penal Code section 186.22, subdivisions (a) and (b).

[2] Penal Code section 667.5, subdivision (b).

2

operate. As part of his duties, Stow read reports about gang investigations; reviewed court records relating to gang prosecutions; read jail letters; and became acquainted with gang symbols, colors, and art work. He had received over 100 hours of formal training in gang recognition and subcultures, offered by various law-enforcement agencies in Southern California and around the nation. He had been involved in over 500 gang-related investigations.

As part of the department's efforts to control gang activity, officers issue what are known as "STEP notices"[3] to individuals associating with known gang members. The purpose of the notice is to both provide and gather information. The notice informs the recipient that he is associating with a known gang; that the gang engages in criminal activity; and that, if the recipient commits certain crimes with gang members, he may face increased penalties for his conduct. The issuing officer records the date and time the notice is given, along with other identifying information like descriptions and tattoos, and the identification of the recipient's associates. Officers also prepare small report forms called field identification or "FI" cards that record an officer's contact with an individual. The form contains personal information, the date and time of contact, associates, nicknames, etc. Both STEP notices and FI cards may also record statements made at the time of the interaction.

Stow testified generally about gang culture, how one joins a gang, and about the Delhi gang in particular. Gangs have defined territories or turf that they control through intimidation. They commit crimes on their turf and protect it against rivals. Nonmembers who sell drugs in the gang's territory and who do not pay a "tax" to the gang risk death or injury. The Delhi gang is named after a park

---

[3] This acronym is a reference to the California Street Terrorism Enforcement and Prevention Act. (Pen. Code, § 186.20 et seq.)

in its territory and has over 50 members. Its primary activities include drug sales and illegal gun possession. Defendant was arrested in Delhi turf. Stow testified about convictions suffered by two Delhi members to establish that Delhi members engage in a pattern of criminal activity. (Pen. Code, § 186.22, subds. (e), (f).)

The questioning then turned to defendant. The prosecutor asked Stow if he was aware that defendant received a STEP notice on June 14, 2011. The prosecutor inquired, "Did the defendant indicate to the police officer in the STEP notice that the defendant for four years had kicked it with guys from Delhi?" and "did the defendant also indicate 'I got busted with two guys from Delhi?' " Stow responded, "Correct" to both. He explained that "kicking it" means "hanging out and associating" with gang members and that people often used the phrase to avoid openly admitting gang membership.

The prosecutor next asked about four other police contacts with defendant between 2007 and 2009. Stow gave the details of each, relating statements contained in police documents: (1) On August 11, 2007, defendant's cousin, a known Delhi member, was shot while defendant stood next to him. Defendant told police then that he grew up "in the Delhi neighborhood." (2) On December 30, 2007, defendant was with Mike Salinas when Salinas was shot from a passing car. Salinas, a documented Delhi member, identified the perpetrator as a rival gang member. (3) On December 4, 2009, an officer contacted defendant in the company of documented Delhi member John Gomez and completed an FI card. (4) Five days later, on December 9, 2009, defendant was arrested in a garage with Gomez and Delhi member Fabian Ramirez. Inside the garage, police found "a surveillance camera, Ziploc baggies, narcotics, and a firearm."

In preparing for trial, Stow compiled a "gang background" on defendant that included the STEP notice and defendant's statements, his contacts with police while in the company of Delhi members, and the circumstances of the present case

4

occurring in Delhi territory. Based on this information, Stow opined that defendant was a member of the Delhi gang. The prosecutor then asked a lengthy hypothetical in which he asked Stow to assume that (1) a Delhi gang member, "who's indicated to the police he kicks it with Delhi and has been contacted in a residence where narcotics and a firearm have been found in the past," is contacted by police in Delhi territory on October 16, 2011; (2) that gang member "grabbed something, and then grabs his waistband" as he runs up the stairs into an apartment; and (3) he runs into the bathroom and police later find a loaded firearm and drugs on a tarp outside the bathroom window. Assuming those facts, Stow gave his opinion that the conduct benefitted Delhi because the gang member was willing to risk incarceration by possessing a firearm and narcotics for sale in Delhi's turf. Stow added that this conduct also created fear in the community redounding to Delhi's benefit.

On cross-examination, Stow admitted he had never met defendant. He was not present when defendant was given the STEP notice, or during any of defendant's other police contacts. Stow's knowledge of the two shootings, as well as the 2009 garage incident, was derived from police reports. His knowledge of the December 4, 2009, contact was based on the FI card. Stow clarified that an officer may fill out an FI card or issue a STEP notice to someone not engaged in any crime or suspicious behavior.

The jury convicted defendant as charged.[4] The Court of Appeal reversed defendant's conviction for active gang participation[5] and otherwise affirmed. We granted defendant's petition for review.

---

[4]    Defendant admitted the allegation that he had served a prior prison term.
[5]    The reversal was based on *People v. Rodriguez* (2012) 55 Cal.4th 1125, which established that the substantive offense of active gang participation required

*(footnote continued on next page)*

## II. DISCUSSION

Defendant contends the expert's description of defendant's past contacts with police was offered for its truth and constituted testimonial hearsay. He urges its admission violated the federal confrontation clause because the declarants were not unavailable and he had not been given an earlier opportunity to cross-examine them. The Attorney General responds that the statements upon which the gang expert based his opinions were not admitted for their truth and, even if they had been, most of the statements were not testimonial.

We first address whether facts an expert relates as the basis for his opinion are properly considered to be admitted for their truth. The confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra,* 541 U.S. at p. 59, fn. 9.) If the Attorney General is correct that statements offered as the basis for an opinion are not admitted for their truth, the statements are not hearsay and our inquiry is at an end. If defendant is correct, the propriety of the statements' admission in this case would turn on whether they constitute testimonial hearsay.

### A. State Evidentiary Rules for Hearsay

Hearsay may be briefly understood as an out-of-court statement offered for the truth of its content. Evidence Code section 1200, subdivision (a) formally defines hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." A "statement" is "oral or written verbal expression" or the "nonverbal

---

*(footnote continued from previous page)*

"that a person commit an underlying felony with at least one other gang member." (*Id*. at p. 1134.)

6

conduct of a person intended by him as a substitute for oral or written verbal expression." (Evid. Code, § 225.) Senate committee comments to Evidence Code section 1200 explain that a statement "offered for some purpose other than to prove the fact stated therein is not hearsay." (Sen. Com. on Judiciary com., 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. § 1200, p. 3; see *People v. Davis* (2005) 36 Cal.4th 510, 535-536.) Thus, a hearsay statement is one in which a person makes a factual assertion out of court and the proponent seeks to rely on the statement to prove that assertion is true. Hearsay is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subd. (b).) Nothing in our opinion today changes the basic understanding of the definition of hearsay.

Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain. Documents may also contain multiple levels of hearsay. An emergency room report, for example, may record the observations made by the writer, along with statements made by the patient. If offered for its truth, the report itself is a hearsay statement made by the person who wrote it. Statements of others, related by the report writer, are a second level of hearsay. Multiple hearsay may not be admitted unless there is an exception for each level. (*People v. Riccardi* (2012) 54 Cal.4th 758, 831 (*Riccardi*).) For example, in the case of the emergency room document, the report itself may be a business record (Evid. Code, § 1270 et seq.), while the patient's statement may qualify as a statement of the patient's existing mental or physical state (Evid. Code, § 1250, subd. (a)).

## B. State Evidentiary Rules for Expert Testimony

While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given

greater latitude. "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc. This latitude is a matter of practicality. A physician is not required to personally replicate all medical experiments dating back to the time of Galen in order to relate generally accepted medical knowledge that will assist the jury in deciding the case at hand. An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue. When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others.

The jury is not required to accept an expert's opinion. The final resolution of the facts at issue resides with the jury alone. The jury may conclude a fact necessary to support the opinion has not been adequately proven, even though there may be some evidence in the record tending to establish it. If an essential fact is not found proven, the jury may reject the opinion as lacking foundation. Even if all the necessary facts are found proven, the jury is free to reject the expert's opinion about them as unsound, based on faulty reasoning or analysis, or based on information the jury finds unreliable. The jury may also reject an opinion because it finds the expert lacks credibility as a witness.

8

The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise. "[T]he common law recognized that experts frequently acquired their knowledge from hearsay, and that 'to reject a professional physician or mathematician because the fact or some facts to which he testifies are known to him only upon the authority of others would be to ignore the accepted methods of professional work and to insist on . . . impossible standards.' Thus, the common law accepted that an expert's general knowledge often came from inadmissible evidence." (Volek, *Federal Rule of Evidence 703: The Back Door and the Confrontation Clause, Ten Years Later* (2011) 80 Fordham L.Rev. 959, 965, fn. omitted, quoting 1 Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* (2d ed. 1923) § 665; see Simons, Cal. Evidence Manual (2014) § 4:23, pp. 313-316.) Knowledge in a specialized area is what differentiates the expert from a lay witness, and makes his testimony uniquely valuable to the jury in explaining matters "beyond the common experience of an ordinary juror." (*People v. McDowell* (2012) 54 Cal.4th 395, 429; see Evid. Code, § 801, subd. (a).) As such, an expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds.

By contrast, an expert has traditionally been precluded from relating *case-specific* facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried. Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts. An expert may then testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-

9

specific facts about which he has no personal knowledge. (*People v. Coleman* (1985) 38 Cal.3d 69, 92 (*Coleman*).)

Going back to the common law, this distinction between generally accepted background information and the supplying of case-specific facts is honored by the use of hypothetical questions. "Using this technique, other witnesses supplied admissible evidence of the facts, the attorney asked the expert witness to hypothetically assume the truth of those facts, and the expert testified to an opinion based on the assumed facts. . . ." (Imwinkelried, *The Gordian Knot of the Treatment of Secondhand Facts Under Federal Rule of Evidence 703 Governing the Admissibility of Expert Opinions: Another Conflict Between Logic and Law* (2013) 3 U.Den. Crim. L.Rev. 1, 5; see Simons, Cal. Evidence Manual, *supra*, § 4:32, pp. 326-327; 2 Wigmore, Evidence (Chadbourn ed. 1978) § 672, p. 933, italics omitted.) An examiner may ask an expert to assume a certain set of case-specific facts for which there is independent competent evidence, then ask the expert what conclusions the expert would draw from those assumed facts. If no competent evidence of a case-specific fact has been, or will be, admitted, the expert cannot be asked to assume it. The expert is permitted to give his opinion because the significance of certain facts may not be clear to a lay juror lacking the expert's specialized knowledge and experience.

The following examples clarify these general principles and their distinctions.

(1) That 15 feet of skid marks were measured at an auto accident scene would be case-specific information. Those facts could be established, for example, through the testimony of a person who measured the marks. How automobile skid marks are left on pavement and the fact that a given equation can be used to estimate speed based on those marks would be background information an expert could provide. That the car leaving those marks had been traveling at 80

10

miles per hour when the brakes were applied would be the proper subject of an expert opinion.

(2) That hemorrhaging in the eyes was noted during the autopsy of a suspected homicide victim would be a case-specific fact. The fact might be established, among other ways, by the testimony of the autopsy surgeon or other witnesses who saw the hemorrhaging, or by authenticated photographs depicting it. What circumstances might cause such hemorrhaging would be background information an expert could provide. The conclusion to be drawn from the presence of the hemorrhaging would be the legitimate subject for expert opinion.

(3) That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang.

(4) That an adult party to a lawsuit suffered a serious head injury at age four would be a case-specific fact. The fact could be established, inter alia, by a witness who saw the injury sustained, by a doctor who treated it, or by diagnostic medical records. How such an injury might be caused, or its potential long-term effects, would be background information an expert might provide. That the party was still suffering from the effects of the injury and its manifestations would be the proper subject of the expert's opinion.

At common law, the treatment of an expert's testimony as to general background information and case-specific hearsay differed significantly. However, the line between the two has now become blurred. Both the common law and early California law recognized two exceptions to the general rule barring disclosure of, and reliance on, otherwise inadmissible case-specific hearsay.

11

These exceptions covered testimony about property valuation and medical diagnoses. As to the former, "courts recognized that experts frequently derived their knowledge by both custom and necessity from sources that were technically hearsay—price lists, newspapers, information about comparable sales, or other secondary sources." (Kaye et al., The New Wigmore: Expert Evidence (2d ed. 2011) § 4.5.1, p. 154; see *In re Cliquot's Champagne* (1865) 70 U.S. 114, 141.) Likewise, physicians often relied on patients' hearsay descriptions of their symptoms to form diagnoses. (See *Barber v. Merriam* (Mass. 1865) 93 Mass. 322, 324-326; see also Kaye et al., § 4.5.1, p. 155; *People v. Wilson* (1944) 25 Cal.2d 341, 348; *Betts v. Southern California Fruit Exch.* (1904) 144 Cal. 402, 408; *People v. Shattuck* (1895) 109 Cal. 673, 678-679; *Hammond Lumber Co. v. Los Angeles County* (1930) 104 Cal.App. 235, 248.)

The justification for these exceptions was threefold: "the routine use of the same kinds of hearsay by experts in their conduct outside the court; the experts' experience, which included experience in evaluating the trustworthiness of such hearsay sources; and the desire to avoid needlessly complicating the process of proof . . . ." (Kaye et al., The New Wigmore: Expert Evidence, *supra*, § 4.5.1, p. 155; see 3 Wigmore, Evidence, *supra*, § 688, p. 4.)

The Legislature's enactment of the Evidence Code in 1965 generalized these common law exceptions. Evidence Code section 801, subdivision (b) provides that an expert may render an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates*, unless an expert is precluded by law from using such matter as a basis for his opinion." (Italics added.) Similarly, Evidence Code section 802 allows an expert

12

to "state on direct examination the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." Under this approach, the reliability of the evidence is a key inquiry in whether expert testimony may be admitted. The California Law Revision Commission comments accompanying the code noted that Evidence Code section 801, subdivision (b) "assures the reliability and trustworthiness of the information used by experts in forming their opinions." (Cal. Law Revision Com. com., reprinted at 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 801, p. 26.)

Accordingly, in support of his opinion, an expert is entitled to explain to the jury the "matter" upon which he relied, even if that matter would ordinarily be inadmissible. When that matter is hearsay, there is a question as to how much substantive detail may be given by the expert and how the jury may consider the evidence in evaluating the expert's opinion. It has long been the rule that an expert may not " 'under the guise of reasons [for an opinion] bring before the jury incompetent hearsay evidence.' " (*Coleman, supra,* 38 Cal.3d at p. 92.) Courts created a two-pronged approach to balancing "an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion" so as not to "conflict with an accused's interest in avoiding substantive use of unreliable hearsay." (*People v. Montiel* (1993) 5 Cal.4th 877, 919 (*Montiel*).) The *Montiel* court opined that "[m]ost often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.] [¶] Sometimes a limiting instruction may not be enough. In such cases, Evidence Code section 352 authorizes the court to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice

13

outweighs its proper probative value. [Citation.]" (*Ibid*., citing *Coleman, supra,* 38 Cal.3d at pp. 91-93.) Thus, under this paradigm, there was no longer a need to carefully distinguish between an expert's testimony regarding background information and case-specific facts. The inquiry instead turned on whether the jury could properly follow the court's limiting instruction in light of the nature and amount of the out-of-court statements admitted. For the reasons discussed below, we conclude this paradigm is no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury.

### C. *Crawford*, Hearsay, and Expert Testimony

The admission of expert testimony is governed not only by state evidence law, but also by the Sixth Amendment's Confrontation Clause, which provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) As the United States Supreme Court observed, "this bedrock procedural guarantee applies to both federal and state prosecutions." (*Crawford, supra,* 541 U.S. at p. 42; see *Pointer v. Texas* (1965) 380 U.S. 400, 406.) " 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*.' " (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Id*. at p. 316.)

Under previous United States Supreme Court precedent, the admission of hearsay did not violate the right to confrontation if it bore "adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 66.) *Crawford* overturned

14

the *Roberts* rule. *Crawford* clarified that a mere showing of hearsay reliability was insufficient to satisfy the confrontation clause. "To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. . . . [¶] The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one." (*Crawford, supra,* 541 U.S. at pp. 61-62.) Under *Crawford*, if an exception was not recognized at the time of the Sixth Amendment's adoption (see *Crawford*, at p. 56, fn. 6), admission of testimonial hearsay against a criminal defendant violates the confrontation clause unless (1) the declarant is unavailable to testify and (2) the defendant had a previous opportunity to cross-examine the witness or forfeited the right by his own wrongdoing. (*Id.* at pp. 62, 68; see *Giles v. California* (2008) 554 U.S. 353, 357-373.)[6]

In light of our hearsay rules and *Crawford*, a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of

---

[6] Because *Crawford* is based on the Sixth Amendment right to confrontation, its rule has not been extended to civil proceedings or circumstances in which hearsay is offered *by* an accused in his own defense. Neither we nor the high court has had occasion to consider the rule when a defendant offers hearsay that may work to the detriment of a codefendant.

such a statement violates the right to confrontation if the statement is *testimonial hearsay*, as the high court defines that term.

We turn first to the general hearsay inquiry. As discussed, some courts have attempted to avoid hearsay issues by concluding that statements related by experts are not hearsay because they "go only to the basis of [the expert's] opinion and should not be considered for their truth." (*Montiel, supra,* 5 Cal.4th at p. 919; see *Coleman, supra,* 38 Cal.3d at p. 92.) If statements related by experts as bases for their opinions are not admitted for their truth, they are not hearsay. Neither the hearsay doctrine nor the confrontation clause is implicated when an out-of-court statement is not received to prove the truth of a fact it asserts. (See *Crawford, supra,* 541 U.S. at p. 59, fn. 9; *Tennessee v. Street* (1985) 471 U.S. 409, 413-414.)

In the context of a confrontation challenge to the admission of certain expert "basis" testimony, the high court addressed the not-for-the-truth rationale in *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221] (*Williams*). *Williams* was a rape prosecution in which the identity of the attacker was disputed. Semen samples were collected from the rape victim and sent to a Cellmark laboratory for DNA analysis. (*Id*. at p. __ [132 S.Ct. at p. 2229].) Cellmark produced a DNA profile purporting to be an accurate profile of the unknown semen donor. Independent of the rape investigation, a sample of Williams's DNA had been acquired and entered in the state's database. That "known" sample from Williams was tested and a profile produced. (*Ibid*.) At trial, a prosecution expert testified that she compared Williams's known profile to the Cellmark profile and, in her opinion, they matched. Williams objected that the Cellmark results, related to the

16

factfinder by the expert,[7] constituted hearsay because they were out-of-court statements by the report writer and were offered to prove their truth: that the profile was, indeed, an accurate profile of the man who committed the rape for which Williams was being tried.

Considering the hearsay question, a four-member plurality of the *Williams* court concluded statements in the Cellmark report were not admitted for their truth, but only to allow the judge, sitting as factfinder, to evaluate the testimony of the expert who opined that the two profiles matched. (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at pp. 2240-2241] [plur. opn. of Alito, J.].) The plurality acknowledged that the prosecution expert "lacked personal knowledge that the profile produced by Cellmark was based on the vaginal swabs taken from the victim," but reasoned the expert was testifying in the manner of a hypothetical question and any linkage between the sample from the victim to the DNA profile created by Cellmark "was a mere premise of the prosecutor's question, and [the expert] simply assumed that premise to be true when she gave her answer indicating that there was a match between the two DNA profiles. There is no reason to think that the trier of fact took [the expert's] answer as substantive evidence to establish where the DNA profiles came from." (*Id.* at p. __ [132 S.Ct. at p. 2236].)

Five justices, the four-member dissent and Justice Thomas writing separately, specifically rejected this approach. In doing so, they called into question the continuing validity of relying on a not-for-the-truth analysis in the expert witness context. Justice Thomas observed that the expert relied upon, as

---

[7]    *Williams* involved a bench trial. The Cellmark report itself was not admitted into evidence. The expert witness was not a Cellmark employee. (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2231].)

17

substantive evidence, Cellmark's representation that, in fact, the sample it tested was that taken from the victim: "[The prosecution expert] opined that petitioner's DNA profile matched the male profile derived from [the victim's] vaginal swabs. In reaching that conclusion, [the expert] relied on Cellmark's out-of-court statements that the profile it reported was in fact derived from [the victim's] swabs, rather than from some other source. *Thus, the validity of [the expert's] opinion ultimately turned on the truth of Cellmark's statements*. The plurality's assertion that Cellmark's statements were merely relayed to explain 'the assumptions on which [the expert's] opinion rest[ed],' [citation], overlooks that the value of [the expert's] testimony *depended on the truth of those very assumptions*." (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2258] [conc. opn. of Thomas, J.], italics added.)**8**)

The dissent also identified another hearsay problem. In addition to asserting that there was a link between the victim's sample and the Cellmark profile, the expert also asserted, as fact, that the Cellmark test was reliable: "Nothing in [the expert's] testimony indicates that she was making an assumption or considering a hypothesis. To the contrary, [the expert] affirmed, without qualification, that the Cellmark report showed a 'male DNA profile found in semen from the vaginal swabs of [the victim].' [Citation.] Had she done otherwise, this case would be different. There was nothing wrong with [the expert's] testifying that two DNA profiles—the one shown in the Cellmark report and the one derived from Williams's blood—matched each other; that was a

---

**8** Justice Thomas concurred in the judgment because he agreed that the Cellmark report was not testimonial due to its lack of sufficient formality. (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at pp. 2259-2260] [conc. opn. of Thomas, J.]; see discussion *post*, at pp. 32-33.)

straightforward application of [her] expertise. Similarly, [the expert] could have added that *if* the Cellmark report resulted from scientifically sound testing of [the victim's] vaginal swab, *then* it would link Williams to the assault. What [the expert] could not do was what she did: indicate that the Cellmark report *was* produced in this way by saying that [the victim's] vaginal swab contained DNA matching Williams's." (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2270] [dis. opn. of Kagan, J.], fn. omitted.)

This reasoning points out the flaw in the not-for-the-truth limitation when applied to case-specific facts. When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth. In such a case, "the validity of [the expert's] opinion ultimately turn[s] on the truth" (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2258] [conc. opn. of Thomas, J.].) of the hearsay statement. If the hearsay that the expert relies on and treats as true is *not* true, an important basis for the opinion is lacking. In *Williams*, the expert's opinion that the Cellmark profile matched the defendant's known profile could not prove that Williams was the semen donor unless the Cellmark profile was, in truth, linked to the victim and was scientifically accurate. Relevant evidence is that which has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) If the hearsay statements about the linkage and accuracy of the Cellmark profile were not *true*, the fact that the two profiles matched would have been irrelevant. That is, the fact that they matched could not have had a tendency in reason to prove the disputed fact of the rapist's identity.

The reasoning of a majority of justices in *Williams* calls into question the premise that expert testimony giving case-specific information does not relate

19

hearsay. In the context of a sufficiency of the evidence claim in a gang case, *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*) pointed to established law that "a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact." (*Id.* at p. 619.) However, *Gardeley* endorsed evidentiary rules allowing a gang expert to rely upon, and testify to, "conversations with the defendants and with other Family Crip members, his personal investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies." (*Id.* at p. 620.) As generally described in *Gardeley,* some of that testimony would be based on the expert's own knowledge and investigation, thus admissible as personal knowledge. Some might be generally accepted background information, admissible under the latitude afforded experts. But some might relate case-specific hearsay, and thus be inadmissible. Courts, both before and after *Gardeley*, have applied similar reasoning to allow gang expert testimony. *Gardeley*'s reasoning that such expert testimony is not admitted for its truth has also been cited in rejecting confrontation challenges to such testimony. (See, e.g. *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154, and cases cited therein; see also *People v. Hill* (2011) 191 Cal.App.4th 1104, 1129-1131 [criticizing *Gardeley* but following it].)[9]

---

[9]     There may be times when an expert does not rely on the truth of a statement when reaching his opinion. For example, an expert may learn that a gang member falsely claimed to have committed a crime to shield an associate from guilt. The expert might conclude that conduct was an example of expected gang loyalty. In such a case the expert could relate the content of the statement and would not be reciting hearsay because the statement would not be offered to prove the speaker did the deed. There may also be times, in a wide variety of cases, when the fact that a statement was made is relevant, regardless of whether the statement was true.

We find persuasive the reasoning of a majority of justices in *Williams*.[10] When an expert is not testifying in the form of a proper hypothetical question and no other evidence of the case-specific facts presented has or will be admitted, there is no denying that such facts are being considered by the expert, and offered to the jury, as true. Indeed, the jury here was given a standard instruction that it "must decide whether information on which the expert relied was true and accurate." (CALCRIM No. 332 [Expert Witness Testimony].) Without independent competent proof of those case-specific facts, the jury simply had no basis from which to draw such a conclusion. The court also confusingly instructed the jury that the gang expert's testimony concerning "the statements by the defendant, police reports, F.I. cards, STEP notices, and speaking to other officers or gang members" should not be considered "proof that the information contained in those statements was true." Jurors cannot logically follow these conflicting instructions. They cannot decide whether the information relied on by the expert "was true and accurate" without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true. "To admit basis testimony for the nonhearsay purpose of jury evaluation of the experts is . . . to ignore the reality that jury evaluation of the expert requires a direct assessment of the truth of the expert's basis." (Kaye et al., The New Wigmore: Expert Evidence, *supra*, § 4.7.2, pp. 179-180; see *Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at pp. 2268-2269] [dis. opn. of Kagan, J.].)

---

[10] Other courts have likewise found persuasive the reasoning of a majority of justices in *Williams* that expert basis testimony is admitted for its truth. (See, e.g., *State v. Navarette* (N.M. 2013) 294 P.3d 435, 439; *Young v. U.S* (D.C. 2013) 63 A.3d 1033, 1047, fn. 53; *Com. v. Greineder* (Mass. 2013) 464 Mass. 580, 592.)

21

Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception.[11] Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner.

In the present case, when the gang expert testified to case-specific facts based upon out-of-court statements and asserted those facts were true because he relied upon their truth in forming his opinion, he was reciting hearsay. Ordinarily, an improper admission of hearsay would constitute statutory error under the Evidence Code. Under *Crawford*, however, if that hearsay was testimonial and *Crawford*'s exceptions did not apply, defendant should have been given the opportunity to cross-examine the declarant or the evidence should have been excluded.[12] Improper admission of such prosecution evidence would also be an error of federal constitutional magnitude.

Our decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. Indeed, an expert's

---

**11** As noted, *ante*, multiple levels of hearsay must each fall within an applicable hearsay exception. (*Riccardi, supra,* 54 Cal.4th at p. 831.)
**12** The People made no showing that the various declarants were unavailable, nor do they argue that defendant forfeited his confrontation rights by any wrongdoing.

background knowledge and experience is what distinguishes him from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth. Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise. Our conclusion restores the traditional distinction between an expert's testimony regarding background information and case-specific facts.

The Attorney General relies on "practical considerations" to support a contrary conclusion. The argument misses the mark. The Attorney General urges that excluding the content of testimonial hearsay would greatly hamper experts from giving opinions about gangs. The argument sweeps too broadly. Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven. They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception. What they cannot do is present, as facts, the content of testimonial hearsay statements. "[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*).) Thus, only when a prosecution expert relies upon, and relates as true, a *testimonial* statement would the fact asserted as true have to be independently proven to satisfy the Sixth Amendment.

Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the "matter"

23

upon which his opinion rests.  A jury may repose greater confidence in an expert who relies upon well-established scientific principles.  It may accord less weight to the views of an expert who relies on a single article from an obscure journal or on a lone experiment whose results cannot be replicated.  There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception.

What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception.  It may be true that merely telling the jury the expert relied on additional kinds of information that the expert only generally describes may do less to bolster the weight of the opinion.  The answer to this reality is twofold.  First, the argument confirms that the proffered case-specific hearsay assertions *are* being offered for their truth.  The expert is essentially telling the jury:  "You should accept my opinion because it is reliable in light of these *facts* on which I rely."  Second, in a criminal prosecution, while *Crawford* and its progeny may complicate some heretofore accepted evidentiary rules, they do so under the compulsion of a constitutional mandate as established by binding Supreme Court precedent.

In sum, we adopt the following rule:  When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth.[13]  If the case is one in which a prosecution expert seeks to relate *testimonial*

---

[13]     We disapprove our prior decisions concluding that an expert's basis testimony is not offered for its truth, or that a limiting instruction, coupled with a

*(footnote continued on next page)*

24

hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing.

### D. Testimonial Nature of the Statements in This Case

#### 1. Legal Background

That holding brings us to the second prong of the analysis in this criminal case. If an out-of-court statement is hearsay because it is being offered for the truth of the facts it asserts, is that statement testimonial hearsay? Throughout its evolution of the C*rawford* doctrine, the high court has offered various formulations of what makes a statement testimonial but has yet to provide a definition of that term of art upon which a majority of justices agree. *Crawford* itself provided no definition other than the term "testimonial" "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Crawford, supra,* 541 U.S. at p. 68.) *Crawford* described the historical abuses leading to the adoption of the confrontation right, including the civil law practice of "requir[ing] justices of the peace to examine suspects and witnesses in felony

---

*(footnote continued from previous page)*

trial court's evaluation of the potential prejudicial impact of the evidence under Evidence Code section 352, sufficiently addresses hearsay and confrontation concerns. (See, e.g., *People v. Bell* (2007) 40 Cal.4th 582, 608; *People v. Montiel, supra,* 5 Cal.4th at pp. 918-919; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1012; *People v. Milner* (1988) 45 Cal.3d 227, 238-240; *People v. Coleman, supra,* 38 Cal.3d at pp. 91-93.) We also disapprove *People v. Gardeley, supra,* 14 Cal.4th 605, to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules.

cases and to certify the results to the court," which "came to be used as evidence in some cases." (*Id*. at p. 44.) *Crawford* clarified that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." (*Id*. at p. 50.)

Crawford was prosecuted for stabbing a man who allegedly tried to rape his wife. After Crawford's arrest, both he and his wife were interviewed by police at the stationhouse. The wife did not testify but the court admitted her statements about the stabbing. *Crawford* concluded that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." (*Crawford, supra,* 541 U.S. at p. 52.) Even if the interviews were not given under oath, if officers conducting them acted like the fact-collecting justices of the peace, the content of their reports was testimonial.

As the *Crawford* doctrine evolved, the court concluded that not all statements made in response to police questioning would constitute testimonial hearsay. In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), the first of two companion cases (No. 05-5224), a woman called 911 seeking help because her boyfriend was in the process of beating her. The caller did not testify but her hearsay statements to the dispatcher were admitted in Davis's subsequent trial. The court concluded that even though the statements were made to a police employee, and some were made in response to the dispatcher's questions, the caller's statements were not testimonial. In doing so, the high court articulated a test based on the "primary purpose" for which the statements are made. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such

26

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id*. at p. 822, italics added.)  The *Davis* court concluded the statements were not testimonial because "the circumstances of [the] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." (*Id*. at p. 828.)

The *Davis* holding was set out in contrast to its companion case, *Hammon v. Indiana* (No. 05-5705) (*Hammon*).  In *Hammon*, police were sent to a home following a report of domestic violence.  They were met by Mrs. Hammon, who initially reported that there had been no problem.  When interviewed outside her husband's presence, she acknowledged he had attacked her.  An officer had her " 'fill out and sign a battery affidavit' " describing the assault.  (*Davis, supra,* 547 U.S. at p. 820.)  Mrs. Hammon declined to testify at the subsequent bench trial but the interviewing officer related her statements and "authenticate[d]" her signed affidavit.  (*Ibid*.)  The high court concluded the statements were testimonial hearsay.  "It is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct" and "[t]here was no emergency in progress . . . ." (*Id*. at p. 829.)  Although acknowledging the in-the-field interview was less formal than the station house questioning in *Crawford*, the court nevertheless reasoned "[i]t was formal enough" and "[s]uch statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Id*. at p. 830.)

*Michigan v. Bryant* (2011) 562 U.S. 344 (*Bryant*) repeated the principle that a statement is testimonial if made "with a primary purpose of creating an out-of-court substitute for trial testimony." (*Id.* at p. 358.)  There, in response to a dispatch, officers came upon a badly injured shooting victim lying in a parking lot.

27

The victim answered questions about the circumstances, location, and perpetrator of the shooting. The victim died and Bryant was charged with his murder. The parking lot statements were admitted and the high court ruled they were not testimonial. *Bryant* refined the "primary purpose" standard by emphasizing the test is objective and takes into account the perspective of both questioner and interviewee: "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." (*Id.* at p. 360.) In concluding the shooting victim's statements to police were nontestimonial, *Bryant* observed that the officers' questioning of the victim was objectively aimed at meeting an ongoing emergency. (*Id*. at pp. 374-376.) The victim's responses indicated the shooter's whereabouts were unknown and there was "no reason to think that the shooter would not shoot again if he arrived on the scene." (*Id*. at p. 377.) Finally, the court observed that the circumstances in which the statements were made were far from formal. The scene was chaotic; the victim was in distress; no signed statement was produced. (*Ibid*.; see *People v. Blacksher* (2011) 52 Cal.4th 769, 816-818.)

A majority in *Davis*, *Hammon*, and *Bryant* adopted the distinguishing principle of primary purpose. Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial.[14] It should be noted that Justice Thomas has consistently

---

**14** In *Bryant*, the court noted, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of

*(footnote continued on next page)*

rejected the primary purpose test.  He criticized the test as being "not only disconnected from history and unnecessary to prevent abuse" but also "yield[ing] no predictable results to police officers and prosecutors attempting to comply with the law." (*Davis, supra,* 547 U.S. at p. 838 [conc. & dis. opn. of Thomas, J.].)  He reasoned that determining the primary purpose of a statement "requires constructing a hierarchy of purpose that will rarely be present—and is not reliably discernible.  It will inevitably be, quite simply, an exercise in fiction." (*Id.* at p. 839.)  Instead of the primary purpose test, Justice Thomas has consistently applied a test turning solely on whether the proffered statement was sufficiently formal to resemble the disapproved civil law procedure reflected, inter alia, in the "Marian statutes" that permitted use of an ex parte examination to establish facts.  (See *Crawford, supra,* 541 U.S. at pp. 50-53.)  In *Davis*, Justice Thomas described the degree of formality required as questioning resulting from a "formalized dialogue" or the taking of statements "sufficiently formal to resemble the Marian examinations" (*Davis*, at p. 840) but not "a mere conversation between a witness or suspect and a police officer" (*id.* at p. 838).  (See *Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at pp. 2259-2261] [conc. opn. of Thomas, J.]; *Bryant, supra,* 562 U.S. at pp. 378-379 [conc. opn. of Thomas, J.].)[15]

---

*(footnote continued from previous page)*

creating an out-of-court substitute for trial testimony." (*Bryant, supra,* 562 U.S. at p. 358.)  The existence of an ongoing emergency "is not the touchstone of the testimonial inquiry" (*id.* at p. 374) but is "simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation" (*id.* at p. 366).

[15]    Justice Thomas would also exclude under the confrontation clause "technically informal statements when used to evade the formalized process." (*Davis, supra,* 547 U.S. at p. 838 [conc. & dis. opn. of Thomas, J.].)

29

The high court stepped beyond the realm of police questioning and applied *Crawford* to scientific test results in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*), and *Bullcoming v. New Mexico* (2011) 564 U.S. 647 (*Bullcoming*). In *Melendez-Diaz*, crime lab analysts prepared documents certifying that a sample of material recovered from the defendant was tested and determined to contain an illegal drug. The certificates were sworn to before a notary public, as required by state law, and admitted at trial in lieu of the analyst's testimony. (*Melendez-Diaz*, at p. 308.) The high court reasoned the certificates "are quite plainly affidavits" (*id*. at p. 310) and "are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination' " (*id*. at pp. 310-311). The court concluded: "[U]nder our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment." (*Id*. at p. 311.)

In *Bullcoming*, an analyst tested the blood sample of an alleged drunk driver. In his lab report, the analyst attested he performed the test using normal protocol and signed the report. The report was admitted into evidence through a surrogate analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." (*Bullcoming, supra,* 564 U.S. at p. 651.) *Bullcoming* rejected the argument that an opportunity to cross-examine the surrogate analyst satisfied *Crawford* and *Melendez-Diaz*. *Bullcoming* noted that the testing analyst reported several facts relating to past events and human actions rather than machine-produced data.[16] The analyst's statements were "meet for cross-examination" (*id*. at p. 660), yet the

---

[16] As we have noted, "Only people can make hearsay statements; machines cannot." (*People v. Leon* (2015) 61 Cal.4th 569, 603; see *People v. Goldsmith* (2014) 59 Cal.4th 258, 274.)

30

"surrogate testimony . . . could not convey what [the analyst] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process [the analyst] employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part" (*id.* at pp. 661-662). *Bullcoming* also rejected the claim that the lab report was nontestimonial. Even though the report was not a formal affidavit, as in *Melendez-Diaz*, it was a sufficiently formal and official document "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, [and so] ranks as testimonial." (*Id.* at p. 664.)

The next case in the evolution of the doctrine was *Williams*. As an alternative to its not-for-the-truth hearsay analysis,[17] the plurality modified the "primary purpose" testimonial test by reasoning the Cellmark report "was not prepared for the primary purpose of *accusing a targeted individual*." (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2243] [plur. opn. of Alito, J.], italics added.) The *Williams* plurality stated: "[T]he primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the [police] lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use *against petitioner*, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile." (132 S.Ct. at pp. 2243-2244, italics added.)

---

**17** See discussion, *ante*, at pages 16-19.

31

Both Justice Thomas's concurrence and the dissent criticized the plurality's expansion of the primary purpose test. Justice Thomas objected that the plurality's "reformulated" primary purpose test "lacks any grounding in constitutional text, in history, or in logic." (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2262] [conc. opn. of Thomas, J.].) The four dissenters agreed there was "no basis in our precedents" for the new test. (132 S.Ct. at p. 2273 .dis. opn. of Kagan, J.].) Justice Thomas reasoned in part that "a declarant could become a 'witnes[s]' before the accused's identity was known." (*Id.* at p. 2262 [conc. opn. of Thomas, J.].) Similarly, the dissent observed that "the typical problem with laboratory analyses—and the typical focus of cross-examination— has to do with careless or incompetent work, rather than with personal vendettas. And as to that predominant concern, it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect." (*Id.* at p. 2274 [dis. opn. of Kagan, J.], fn. omitted.) Both the concurrence and dissent also criticized the plurality's conclusion that an emergency existed because the test was done "to catch a dangerous rapist who was still at large." (*Id.* at p. 2243 [plur. opn. of Alito, J.].) The separate opinions noted the DNA testing was conducted several months after the rape. (See *id.* at p. 2263 [conc. opn. of Thomas, J.]; *id.* at p. 2274 [dis. opn. of Kagan, J.].) The dissent would have concluded the Cellmark report was testimonial under the reasoning of *Melendez-Diaz* and *Bullcoming.* (*Id.* at p. 2277 [dis. opn. of Kagan, J.].)

While Justice Thomas agreed with the plurality that the report was not testimonial, he did so on the narrow ground that the statement was not sufficiently formal. The report lacked "the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact," and also did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained." (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2260] [conc. opn.

of Thomas, J.].)  He also reasoned "it was not the product of any sort of formalized dialogue resembling custodial interrogation."  (*Ibid*.)

Our court applied *Williams* in the companion cases of *People v. Lopez* (2012) 55 Cal.4th 569 (*Lopez*), and *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*).[18]  *Lopez* involved a vehicular manslaughter prosecution.  A criminalist, Willey, testified that a colleague from his lab, Pena, had analyzed a sample of the defendant's blood and concluded the blood-alcohol level was 0.09 percent.  Willey was familiar with the procedures Pena used and, "based on his own 'separate abilities as a criminal analyst,' he too concluded that the blood-alcohol concentration in defendant's blood sample was 0.09 percent."  (*Lopez*, at p. 574.)  Pena's report was admitted into evidence.  (*Ibid*.)

The majority opinion concluded Pena's report was not testimonial because it was insufficiently formal.  (*Lopez, supra,* 55 Cal.4th at pp. 582-585.)  Two concurrences also received majority support.  The first agreed the report was not testimonial, but also reasoned that the testimony at issue did not fall within "a fair and practical boundary for applying the confrontation clause."  (*Id*. at p. 586 [conc. opn. of Werdegar, J.].)  "The demands of the confrontation clause were properly satisfied in this case by calling a well-qualified expert witness to the stand, available for cross-examination, who could testify to the means by which the critical instrument-generated data was produced and could interpret those data for the jury, giving his own, independent opinion as to the level of alcohol in defendant's blood sample."  (*Id*. at p. 587 [conc. opn. of Werdegar, J.].)  The

---

**18**　　We also decided a third case, *People v. Rutterschmidt* (2012) 55 Cal.4th 650, which involved a confrontation claim against a lab director's testimony about a test he did not conduct.  We concluded the testimony was harmless beyond a reasonable doubt without deciding whether its admission was proper.  (*Id*. at p. 661.)

second concurrence characterized the chain-of-custody notations in Pena's report as nontestimonial business records whose primary purpose was to facilitate laboratory operations, not to produce facts for later use at trial. (*Id*. at pp. 587-590 [conc. opn. of Corrigan, J.].)

*Dungo* more directly addressed the testimony of an expert witness. That case involved a murder prosecution in which the autopsy surgeon, Dr. Bolduc, was not called as a witness. Instead, pathologist Lawrence testified, relying on Bolduc's autopsy report and photographs. Lawrence opined the victim had been strangled, basing his opinion on factual observations noted in Bolduc's autopsy report, such as the presence of hemorrhaging in the neck and eyes, the purple color of her skin, the presence of an intact hyoid bone, and the fact that the victim had bitten her tongue shortly before death. (*Dungo, supra,* 55 Cal.4th at p. 614.) Neither Bolduc's report nor autopsy photos were admitted into evidence. (*Id*. at p. 615.)

The *Dungo* majority concluded the objective facts contained in an autopsy report were not sufficiently formal to be testimonial. (*Dungo, supra,* 55 Cal.4th at p. 619 [maj. opn. of Kennard, J.].) The majority also concluded the *primary* purpose of recording such facts was not to preserve evidence for a criminal prosecution. Instead, producing evidence "was only one of several purposes." (*Id*. at p. 621.) The first concurrence, which also garnered a majority, expanded on these points. With respect to formality, Justice Werdegar reasoned, "The process of systematically examining the decedent's body and recording the resulting observations is thus one governed primarily by *medical* standards rather than by legal requirements of formality or solemnity." (*Id*. at p. 624 [conc. opn. of Werdegar, J.].) She also observed that because coroners have a statutory duty to determine cause of death regardless of whether a criminal investigation is ongoing, "the nontestimonial aspects of these anatomical observations predominate over the

34

testimonial." (*Id*. at p. 625.) A second concurrence, which likewise garnered a majority, concluded the factual observations in the autopsy report were not testimonial under the combined tests of the plurality and Justice Thomas in *Williams*. As discussed, Justice Thomas did not join in the plurality's reasoning but rested his concurrence on his narrower formality analysis. The second concurrence in *Dungo* determined that, because the *Dungo* facts could satisfy both the analyses of the *Williams* plurality and Justice Thomas, there was sufficient high court precedent to uphold Dungo's conviction. (*Dungo*, at pp. 629-633 [conc. opn. of Chin, J.].)

The high court returned to the primary purpose test in *Ohio v. Clark* (2015) 576 U.S. __ [135 S.Ct. 2173] (*Clark*). Clark was tried for beating a three-year-old boy, L.P. The child did not testify but the state presented evidence he told a teacher that Clark had assaulted him. *Clark* concluded that "[b]ecause neither the child nor his teachers had the primary purpose of assisting in Clark's prosecution, the child's statements do not implicate the Confrontation Clause and therefore were admissible at trial." (135 S.Ct. at p. 2177.) The court also noted as an "additional factor" the informality of the statements. (*Id*. at p. 2180.) The court reasoned: "There is no indication that the primary purpose of the [teacher/child] conversation was to gather evidence for Clark's prosecution. On the contrary, it is clear that the first objective was to protect L.P. At no point did the teachers inform L.P. that his answers would be used to arrest or punish his abuser. L.P. never hinted that he intended his statements to be used by the police or prosecutors. And the conversation between L.P. and his teachers was informal and spontaneous. The teachers asked L.P. about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse. This was nothing like the formalized station-house

35

questioning in *Crawford* or the police interrogation and battery affidavit in *Hammon*." (*Id*. at p. 2181.)[19]

### 2. *These Police Reports Are Testimonial*

As noted, Stow testified about defendant's five prior police contacts. He learned about three of these solely through police reports: (1) on August 11, 2007, defendant was standing nearby when his cousin was shot;[20] (2) on December 30, 2007, defendant's companion, a known Delhi member, was shot; and (3) on December 9, 2009, defendant was arrested with Delhi gang members in a garage where drugs and firearms were found. These reports were not admitted into evidence and are not part of the appellate record. However, Stow's testimony reveals that these reports were compiled during police investigation of these completed crimes. Stow relied upon, and related as true, these case-specific facts from a narrative authored by an investigating officer. While less formal, these reports are somewhat similar to the battery affidavit in *Hammon*. They relate hearsay information gathered during an official investigation of a completed crime.

When the People offer statements about a completed crime, made to an investigating officer by a nontestifying witness, *Crawford* teaches those hearsay

---

[19] In *Clark*, the high court discussed for the first time an issue it had "repeatedly reserved," i.e., "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause." (*Clark, supra,* 576 U.S. at p. __ [135 S.Ct. at p. 2181].) The court "decline[d] to adopt a categorical rule excluding them from the Sixth Amendment's reach" but noted "such statements are much less likely to be testimonial than statements to law enforcement officers." (*Ibid*.) Accordingly, whether a statement was made by or to a government investigating agent remains an important, but not dispositive, part of the analysis.

[20] This report contained a second level of hearsay: the cousin's statement to the reporting officer.

statements are generally testimonial unless they are made in the context of an ongoing emergency as in *Davis* and *Bryant*, or for some primary purpose other than preserving facts for use at trial. Further, testimonial statements do not become less so simply because an officer summarizes a verbatim statement or compiles the descriptions of multiple witnesses. As the *Davis* court observed: "[W]e do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition. Indeed, if there is one point for which no case—English or early American, state or federal—can be cited, that is it." (*Davis, supra,* 547 U.S. at p. 826.) Citing *Palmer v. Hoffman* (1943) 318 U.S. 109, *Melendez-Diaz* reasoned: "There we held that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's operations, it was 'calculated for use essentially in the court, not in the business.' [Citation.] The analysts' certificates—*like police reports generated by law enforcement officials*—do not qualify as business or public records for precisely the same reason." (*Melendez-Diaz, supra,* 557 U.S. at pp. 321-322, italics added, fn. omitted.)[21]

Similarly, in rejecting the argument that testimony by a surrogate analyst satisfied confrontation principles because the testing analyst merely recorded objective facts, *Bullcoming* presented the following scenario: "Suppose a police

_____

[21] Business records are defined as writings made in the regular course of business, at or near the time of the event, and created through sources of information and a method of preparation reflecting its trustworthiness. (Evid. Code, § 1271; see also Evid. Code, § 1280 [record by public employee].) When a record is not made to facilitate business operations but, instead, is primarily created for later use at trial, it does not qualify as a business record. (See *Lopez, supra,* 55 Cal.4th at pp. 587-590 [conc. opn. of Corrigan, J.].)

37

report recorded an objective fact [such as an] address above the front door of a house or the read-out of a radar gun. [Citation.] Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically 'No.' " (*Bullcoming, supra,* 564 U.S. at p. __ [131 S.Ct. at pp. 2714-2715].)

Citing the *expanded* primary purpose test of the *Williams* plurality, the Attorney General argues that the police reports regarding the two 2007 shootings were not testimonial *as to defendant* because they did not accuse him of a crime. He was merely a witness in those shootings and was "neither in custody nor under suspicion at the time."[22] The argument overlooks the fact that the expanded test created by the *Williams* plurality was expressly rejected by a majority of justices in that case. (See *Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at pp. 2261-2263 [conc. opn. of Thomas, J.]; 132 S.Ct. at pp. 2273-2274 [dis. opn. of Kagan, J.]].) As those justices reasoned, the plurality's "targeted individual" addendum has no basis in the language of the confrontation clause, its history, or post-*Crawford* jurisprudence.

### 3.  This STEP Notice Is Testimonial

Detective Stow also opined that defendant was a gang member based on the retained portion of a STEP notice issued in June 2011. In the course of his testimony, Stow related the content of statements made in the STEP notice. The Attorney General argues that STEP notices are not testimonial because they are

---

[22]   The Attorney General appears to concede that the police report regarding the December 9, 2009, incident, in which defendant was arrested in the garage, was accusatory as to him.

not created for the primary purpose of producing evidence for later use at trial. She notes a STEP notice may serve many purposes, including "a community outreach effort to dissuade gang members and associates from continuing to engage in gang behavior by apprising them of the potential penalties they faced if they continued to do so." Defendant counters that STEP notices are testimonial because the issuing officer signs the notice under penalty of perjury and memorializes any incriminating statements for future evidentiary use.[23]

It may be true that "[a] STEP notice informs suspected individuals that law enforcement believes they associate with a criminal street gang." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1414, fn. 1.) As Stow testified, a person need not be engaged in any criminal activity to receive a STEP notice. Because the *giving* of the notice has a community policing function designed to dissuade future gang participation and criminal activity, the Attorney General argues the notice is not produced for a primary purpose of establishing past facts at a future trial.

However, the portion of the STEP notice relied upon by Stow was that part *retained* by police. That portion recorded defendant's biographical information, whom he was with, and what statements he made. It cannot be said that *defendant's* primary purpose in making the statements was to establish facts to be later used against him or his companions at trial. However, it seems clear the officer recorded the information for that purpose. If that were not the case, there would appear to be no need for the issuing officer to swear to its accuracy. It also

---

[23] It does not appear that Stow specifically testified an officer issuing a STEP notice signs the notice or swears to its accuracy. However, the Attorney General appears to agree that the STEP notice was "sworn by the officer under penalty of perjury . . . ."

appears that another purpose of the STEP notice is its later use to prove that the recipient had actually been made aware that he was associating with a criminal street gang and that he might receive an enhanced punishment should he commit a future crime with members of that gang.

As to formality, the notice is part of an official police form containing the officer's sworn attestation that he issued the notice on a given date and that it accurately reflected the attendant circumstances, including defendant's statements. As such, the notice seems little different from the sworn attestation by the analyst in *Melendez-Diaz*, and more formal than the unsworn report found testimonial in *Bullcoming*. (See *Bullcoming, supra,* 564 U.S. at p. __ [131 S.Ct. at pp. 2710-2711]; *Melendez-Diaz, supra,* 557 U.S. at pp. 308-311.)

The notice appears sufficiently formal to satisfy Justice Thomas's approach as well. In his *Williams* concurrence, Justice Thomas concluded the Cellmark report was not sufficiently formal to be testimonial. He reasoned the report was "neither a sworn nor a certified declaration of fact" because it did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained." (*Williams, supra,* 567 U.S. at p. __ [132 S.Ct. at p. 2260] [conc. opn. of Thomas, J.].) Here the converse is true. The issuing officer made a sworn declaration under penalty of perjury that the representations in the STEP notice were true.

### 4. FI Cards May Be Testimonial

Finally, Detective Stow also related facts from an FI card reflecting a police contact with defendant on December 4, 2009, while he was in the company of a known Delhi member. The Attorney General argues the primary purpose of FI cards is to gather information for "community policing efforts" and "potential civil injunctions." Defendant contends that the particular encounter memorialized in

40

the FI card occurred " 'during the course of the investigation' " of defendant's December 9, 2009, arrest for drug possession. Because the card was "produced" during that later investigation, defendant asserts its primary purpose was evidentiary, rendering it testimonial.

As defendant suggests, Stow's testimony regarding the origins of the FI card here was confusing. On cross-examination, Stow acknowledged he did not fill out the card. Defense counsel inquired how Stow could verify the FI card was accurate if he was not there when it was produced. Stow responded: "Well, there is also a police report that supports it. That F.I. *was written during the course of the investigation of his '09 arrest.*" (Italics added.)

If the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial. Because the parties did not focus on this issue, the point was not properly clarified, leaving the circumstances surrounding the preparation of the FI card unclear. We need not decide here whether the content of this FI card was testimonial. Even assuming it was not, for the reasons discussed below, we conclude that Stow's testimony based on the police reports and STEP notice was prejudicial.

### 5. *Harmless Error*

As noted, improper admission of hearsay may constitute state law statutory error. Here, however, much of the hearsay was testimonial. Accordingly, defendant contends that because the confrontation violation prejudiced him with respect to the gang enhancement, the enhancement must be stricken. The Attorney General argues that any confrontation error was harmless beyond a reasonable doubt. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 874; *Lopez, supra,* 55 Cal.4th at p. 585; *Cage, supra,* 40 Cal.4th at p. 979, fn. 8.) Determining prejudice

requires an examination of the elements of the gang enhancement and the gang expert's specific testimony.

The gang enhancement applies to one who commits a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).) "In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period." (*Gardeley, supra,* 14 Cal.4th at p. 617, italics omitted; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047.)

Defendant raises no confrontation claim against Detective Stow's background testimony about general gang behavior or descriptions of the Delhi gang's conduct and its territory. This testimony was based on well-recognized sources in Stow's area of expertise. It was relevant and admissible evidence as to the Delhi gang's history and general operations.

However, Stow's case-specific testimony as to defendant's police contacts was relied on to prove defendant's intent to benefit the Delhi gang when committing the underlying crimes to which the gang enhancement was attached. Stow recounted facts contained in the police reports and STEP notice to establish defendant's Delhi membership. While gang membership is not an element of the gang enhancement (*People v. Valdez* (2012) 55 Cal.4th 82, 132), evidence of defendant's membership and commission of crimes in Delhi's territory bolstered

42

the prosecution's theory that he acted with intent to benefit his gang, an element it was required to prove.

The Attorney General argues any confrontation violation was harmless because it was uncontradicted that Delhi is a street gang whose primary activities include drug sales and illegal weapons possession. This assertion may be true, but the great majority of evidence that defendant associated with Delhi and acted with intent to promote its criminal conduct was Stow's description of defendant's prior police contacts reciting facts from police reports and the STEP notice. The Attorney General observes that, when arrested for the charged offenses, defendant possessed several bindles of drugs and an illegal firearm, reflecting the same activities as the gang's. Further, Stow testified that no one could sell drugs in gang territory without paying a tax to the gang. If defendant was selling drugs in Delhi territory, he could not have done so without paying a tax, which would have shown he acted with intent to benefit the gang regardless of whether he was a member. Thus, the Attorney General urges, "Detective Stow's testimony regarding appellant's five prior contacts was mere surplusage."

These arguments are unconvincing. Excluding Stow's case-specific hearsay testimony, the facts of defendant's underlying crimes revealed that, acting alone, he possessed drugs for sale along with a weapon to facilitate that enterprise. Stow provided general and admissible evidence that if a nonmember sold drugs in a gang's territory and failed to pay a tax, that person risked gang retaliation. However, contrary to the Attorney General's claim, one cannot deduce, merely from this evidence, that when defendant possessed drugs for sale in Delhi territory, he was associated with the gang, would pay a tax, or intended to "promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).) A drug dealer may possess drugs in saleable quantities, along with a firearm for protection, regardless of any gang affiliation, and without an intent to

43

aid anyone but himself. The prosecution's theory of the case was that defendant acted in association with Delhi and committed the underlying offenses intending to benefit the gang. The main evidence of defendant's intent to benefit Delhi was Stow's recitation of testimonial hearsay. Under these circumstances, we cannot conclude that admission of Stow's testimony relating the case-specific statements concerning defendant's gang affiliation was harmless beyond a reasonable doubt. We therefore reverse the true findings on the street gang enhancements.[24]

## III. DISPOSITION

The true findings on the street gang enhancements are reversed. The judgment of conviction is otherwise affirmed and the matter remanded to the Court of Appeal for proceedings not inconsistent with this opinion.

CORRIGAN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

---

[24] Whether the gang allegations may be retried is an issue neither raised nor briefed and we express no views on it.

44

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Sanchez

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 223 Cal.App.4th 1
**Rehearing Granted**

_____

**Opinion No.** S216681
**Date Filed:** June 30, 2016

_____

**Court:** Superior
**County:** Orange
**Judge:** Steven D. Bromberg

_____

**Counsel:**

John L. Dodd, under appointment by the Supreme Court, for Defendant and Appellant.

Lisa M. Romo for Pacific Juvenile Defender Center as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Steven T. Oetting, Deputy State Solicitor General, Peter Quon, Jr., Susan Miller and Lynne McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John L. Dodd
John L. Dodd & Associates
17621 Irvine Boulevard, Suite 200
Tustin, CA  92780
(714) 731-5572

Steven T. Oetting
Deputy State Solicitor General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 645-2206