Filed 11/29/21  P. v. Turner CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073852 |
| v. | (Super.Ct.No. FSBSS802420) |
| RICHARD DALE TURNER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Lorenzo R. Balderrama. Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

1

Appellant Richard Turner is a 63-year-old man diagnosed with pedophilic disorder and antisocial personality disorder incarcerated in a state hospital due to his prior convictions for child molestation. In June 2008, the People brought a petition under Welfare and Institutions Code section 6600 et seq., to have Turner recommitted as a sexually violent predator (SVP). After considerable delay, they supported their petition at trial in 2019 with the testimony of two experts who said they had concluded Turner met the statutory definition of an SVP and he posed a significant risk of reoffending if released. A jury found the allegations that Turner met the criteria for being designated an SVP to be true, and the trial judge ordered Turner committed to a state mental hospital for an indeterminate term.

Turner argues—as his trial counsel did before and during the trial—that the People's experts, when explaining their conclusions, improperly related to the jury numerous case-specific out-of-court statements concerning the details of Turner's offenses, uncharged incidents of molestation, as well as information about his conduct while incarcerated and his medical condition. He points us to the California Supreme Court's recent admonition that, "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception [or] . . . the evidence can be admitted through an appropriate witness and the expert may assume

2

its truth in a properly worded hypothetical question in the traditional manner." (*People v. Sanchez* (2016) 63 Cal.4th 665.)

Turner argues the case-specific instances of hearsay in his case were not covered by a recognized exception to the hearsay rule and the facts contained in them were not independently proven by competent evidence. He concludes the evidence should have been excluded and argues the jury finding must be reversed because the admission of the hearsay evidence was prejudicial.

Turner's trial counsel objected to the admission of this evidence by motion before trial and renewed the objection repeatedly throughout trial. In each case, the trial judge overruled the objection and noted that further objection would be futile. Turner argues these remarks as to the futility of the objections was improper commentary by the trial judge which created the impression that he was allying himself with the People. He says the judge deprived him of due process and a fair trial by conducting himself in that manner.

We conclude the most damaging hearsay statements the experts recounted in setting out the basis for their opinions were admissible under the exception to the hearsay rule for admissions of parties to litigation, since the details about his past incidents of child molestation (charged and uncharged) and his scouting behavior while on parole came from Turner's own statements made to psychologists and a parole officer. The remaining instances of hearsay Turner challenges were harmless. We also conclude the trial court did not commit misconduct by noting the defense objections were "futile."

That designation was something Turner's trial counsel requested as a safeguard against his forfeiting the objection by failing to restate it later in the proceedings.

We therefore affirm the judgment and Turner's civil commitment as an SVP.

# I

# FACTS

The basic facts about why Turner is being held in a state hospital after the completion of his prison term and subjected to proceedings under the SVP Act are straightforward and not at issue in this appeal.

In 1977, he was convicted of committing a lewd and lascivious act on a child under 14 years old for molesting a five-year-old girl. He was sentenced to Patton State Hospital and discharged in 1982. Then, in 1991, he was convicted of two counts of lewd and lascivious acts on children under 14 years old for molesting two girls, one six years old and one eight years old. He was sentenced for those offenses to five years in prison and paroled in 1994.

After his release, the Legislature enacted the Sexually Violent Predators Act (SVPA), which became effective on January 1, 1996. (*People v. Roberge* (2003) 29 Cal.4th 979, 984.) The SVPA allows for the involuntary civil commitment of sex offenders after they have completed their prison terms if they're found to be sexually violent predators. (*Ibid.*)

Turner was returned to prison in 1998 after a conviction for an offense that did not involve child molestation and sentenced to seven years in prison. He was released in June

4

2004, but returned to prison when he violated his parole in March 2005 by failing to attend sex offender treatment. He was released again in July 2005, but violated his parole the next month by going to a place where children congregate. He's been in custody at Coalinga State Hospital since that time. When his term was due to end, the People filed a petition for his civil commitment as a sexually violent predator under the SVPA.

A. *Dr. William Damon's Evaluation of Turner*

Dr. William Damon is a licensed clinical psychologist who works as an SVP evaluator for the California Department of State Hospitals. He performed two evaluations of Turner, one in 2015 and a second in 2019. Both times, he determined Turner meets the statutory criteria and is a sexually violent predator.

Dr. Damon first testified about Turner's qualifying offenses. He identified the conviction in 1977 for molesting a five-year-old girl as the first qualifying offense. He related that the police report said Turner found the girl playing air hockey by herself in a bowling alley and lured her outside saying he wanted her company while waiting for the bus. He took her into an alley and kissed her vaginal area and buttocks. She called out for her father, who arrived and detained Turner. Dr. Damon also reported that in 2005 Turner had told another psychologist the same basic story—that he took the girl outside by a trash bin and fondled her and orally copulated her. Damon interviewed Turner about the offense himself. Turner told him he was playing pinball in the bowling alley when a seven- or eight-year-old girl approached him. He said he picked her up so she could play

5

the game and later took her outside by a trash can where he touched her buttocks under her clothes.

Dr. Damon identified the two 1991 convictions for molesting the six- and eight-year old girls on separate occasions as the second and third qualifying offenses. Dr. Damon related that those incidents occurred when Turner took advantage of being alone with them in a car at a drive-in movie theater. He fondled the buttocks of one child and the chest of the other. Dr. Damon said he learned some details about the incidents by reviewing reports by two other psychologists from 2005. The psychologists' reports said Turner admitted he had intentionally squeezed one child's buttocks and the other child's chest and he was sexually excited by the contact. He told another psychologist he had seen one of the children three times in his life, was turned on by the girls, and that he was surprised by the reaction and had not planned to molest them.

Dr. Damon also testified about facts that indicated there was a likelihood Turner would reoffend. He based his ultimate opinion on interviews he conducted with Turner but also on evidence from prior written reports and evaluations. From those, Dr. Damon related case-specific out-of-court statements to the jury in explaining his conclusions.

Dr. Damon testified about Turner's problems complying with conditions of parole. He said Turner's file indicated he had violated his parole in March 2005 by failing to attend sex offender treatment and again in July 2005 for contacting children. Dr. Damon said he learned from a parole officer report that Turner had admitted he frequented swimming pools in apartment complexes where children were known to congregate.

Dr. Damon also testified at length about Turner's prior statements to other psychologists about his history of child molestation, including numerous offenses for which he'd been neither caught nor punished. In 2004, Turner told Dr. Owen that he was turned on by controlling and dominating children. In 2005, he told Dr. Davis and Dr. Schwartz he had 15 child molestation victims and described eight of them in detail to Dr. Davis. In 1985, he told Dr. McSpeedan he had 15 child molestation victims and said he had touched their genitals and orally copulated one. In 2005, he told Dr. Clipson he had 15 child victims between the ages of six and 15. He also told Dr. Clipson he was sexually aroused during the incidents. He said he often masturbated to fantasies of touching the victims, he was attracted to the shape and figures of kids aged eight to 14, and he thought kids shouldn't wear tight clothes. In 2004, he told Dr. Davis he had had fantasies about female children until a few years prior, and that about 40 percent of his fantasies involved kids aged six to 13.

Dr. Damon testified about details of some of those incidents taken from the prior psychologist reports. Dr. Damon said Turner told Dr. Davis about a child he molested in the mid-1970s, a nine-year-old girl who was probably a cousin. He told Dr. Davis she was very attractive and reported that they "played doctor" in the back of a car. He said he pretended to examine her vaginal area, which aroused him. Dr. Damon reported Turner told Dr. Davis he had molested a seven- or eight-year-old girl who lived near him. He said he knew her parents from church, but he didn't have a relationship with her. He said he fondled her vagina five times over a week.

7

Dr. Damon also reported Turner's conflicting statements about the incident that resulted in a conviction in 1976 for misdemeanor annoying or molesting a child. In 1985, Turner told Dr. McSpeedan the girl was 10 years old and a stranger, and he had put his hand in her pants and touched her vagina and buttocks. He told Dr. Clipson in 2005 that the victim was an 11- or 12-year-old stranger, and that he had fondled every part of her he could. However, in 2004, he told Dr. Davis he was fishing off a pier and heard some children argue, and ended up taking a walk with the girl. He told Dr. Davis all they did was talk. Dr. Damon asked Turner about the incident, and Turner said he met a "7- or 8-year-old white female stranger, and he said that he walked with her to the end of the jetty. He hugged her, and he said that he touched her butt over her—over and under her clothes. He said the incident lasted about 30 minutes. He reported being a little turned on by her. And when I asked him if he played doctor with this victim, this was the one that he admitted that he had, and he said that he did a little—a little physical exam by touching her privates, and he admitted touching her vagina and butt skin-to-skin."

According to Dr. Damon, the fact that Turner repeatedly offended even after having been caught and punished in the 1970s indicated a high risk he would reoffend. "He's had three detections and sanctions for molesting prepubescent children. And so that, again, is relevant to his Pedophilic Disorder diagnosis. It's also relevant to risk in terms of the fact that he continues to offend despite sanction. He offends when he's on supervised release for a prior sexual offense. He offends despite being sent to a psychiatric hospital for five years as a mentally disordered sex offender. He offends

despite being registered as a sex offender. So there's all these barriers that are put in place to hopefully prevent future offending that have not worked for Mr. Turner."

Dr. Damon then testified that having an unstable employment history and relationship history are factors indicating a propensity to reoffend. He said Turner told him he had held multiple jobs but never stayed at any one job for longer than two years. Dr. Damon also introduced evidence indicating Turner had an unstable relationship history. The evidence came mostly from Turner's own conflicting statements to other psychologists. Turner told Dr. Owen in 2004 he was married to a woman named Brenda, and their twin children were killed in a car accident. Turner told Dr. Schwartz in 2004 that he had been married once, to a woman named Susan. He told Dr. Davis in 2004 that his wife and three children were killed in a car accident, and he had a second marriage later. Turner had told Dr. McSpeedan he had lived with a woman named Debbie.

According to Dr. Damon, Turner also made conflicting statements about having a daughter named Tabitha. A social work progress note made from 2018 mentioned Turner's adult daughter Tabitha had a miscarriage and lost twins. An interdisciplinary note from the same year in 2018 indicated Turner told a staff member his daughter had her arm amputated after she was shot in a Las Vegas mass shooting. However, according to Dr. Damon, none of the past evaluators ever mentioned a daughter named Tabitha. Dr. Damon said these inconsistencies indicated chronic deception and presented a risk factor, making it difficult to trust Turner when he said he no longer fantasizes about children.

9

Dr. Damon also testified Turner had a history of institutional behavioral problems, which he said was another factor indicating a risk that Turner would reoffend. Dr. Damon communicated the contents of two interdisciplinary notes made in November 2015, which said Turner punched a wall in anger during therapy group sessions. He related another disciplinary note from March 2016, which said Turner had a verbal altercation with another patient and swore at a staff member. He testified about a progress note from September 2017, which described another altercation Turner had with a patient. Dr. Damon testified that the various behavioral problems documented by other doctors and staff at Coalinga State Hospital reflected poorly on Turner's ability to self-regulate. He said this kind of incident showed verbal aggression and emotional instability, which were risk factors for reoffending.

Dr. Damon also testified about Turner's poor participation in sex offender treatment. He said Turner told Dr. Davis in 2004 that he did not participate in sex offender treatment. Dr. Damon asked Turner whether that was true, and Turner confirmed it was. Dr. Damon testified Turner's first parole revocation, in 2005, was for failure to participate in sex offender treatment while on parole. He also testified Turner's medical records over the past 13 years indicated inconsistent attendance and that he didn't complete homework assignments and dropped out of treatment without completing it.

Finally, Dr. Damon testified about Turner's medical condition and relied on and related information from Turner's medical records. Dr. Damon said Turner had reported

chest pains to other doctors and told him he had suffered heart attacks in 2001 and in 2002. However, he reported Turner's medical records didn't show he had suffered heart attacks, and in 2014 his treatment plan ruled out heart disease. Dr. Damon said treatment notes from August 2014 indicated Turner admitted using complaints of chest pain to obtain attention from staff members. Dr. Damon also offered the details of four interdisciplinary notes made by unidentified medical personnel during 2015 and 2016. Dr. Damon concluded Turner was malingering with regard to his heart problems. "[O]ver several years, he's complained of chest pains for secondary gain, including attention, leaving the hospital to see the outside world, getting better food, et cetera." Ultimately, Dr. Damon said he did not find evidence of medical problems that would prevent Turner from reoffending.

Dr. Damon concluded Turner presented an above average risk of reoffending if released and concluded Turner qualified as a sexually violent predator.

B. *Dr. Joseph Lockhart's Evaluation of Turner*

Dr. Joseph Lockhart is a licensed clinical psychologist and SVP evaluator for the Department of State Hospitals. He conducted a replacement evaluation of Turner, interviewing him in February 2017. Dr. Lockhart opined Turner met all three SVP criteria. Like Dr. Damon, he concluded the qualifying offenses from 1977 and 1991 met the first SVP criterion. He concluded Turner also met the second SVP criterion because Turner suffered from pedophilic disorder and antisocial personality disorder.

11

Dr. Lockhart related information he had gleaned from the reports of prior psychologists as support for his conclusions about Turner's history of offending. He testified Turner had reported to Dr. Davis of having between 15 to 30 child molestation victims. He testified about the details Turner provided to Dr. McSpeedan about the molestation of a five year old in the 1970s—that he had orally copulated the girl on a trash bin outside the bowling alley. Dr. Lockhart said he also interviewed Turner about the 2005 parole officer's report, and Turner told him he would visit swimming pools and amusement parks in part to gratify his sexual interest in children. Dr. Lockhart testified that Turner's long history of offenses shows a stable sexual interest in children, for purposes of his SVP evaluation.

Dr. Lockhart concluded Turner's participation in sex offender treatment was inadequate. He described the 12-week training modules used in Coalinga Hospital for sex offender treatment, noting Turner had failed to progress further than partial completion of module one. He said Turner initially told him he had participated in groups and other sex offender treatment, but when confronted with the lack of records documenting such treatment, Turner admitted he hadn't really attended those groups until a few weeks before their discussion.

Dr. Lockhart discounted Turner's version of his employment, relationship, and sexual history because it was full of inconsistencies. He concluded the events Turner identified could not fit into a coherent timeline, were very unlikely, or varied too dramatically to be credited. He gave as an example Turner's statements about his

12

daughter Tabitha, who he identified as his primary social contact. He sometimes called Tabitha his biological daughter, but other times called her his stepdaughter. He said he spoke with her daily but couldn't provide her contact information. Turner also said he had a son but was inconsistent about whether the son was alive or dead. The work history Turner described to Dr. Lockhart included jobs such as military officer, tow truck driver, and carnival ride jockey, but the work dates conflicted with the times Turner was incarcerated in state hospital.

Dr. Lockhart testified Turner's institutional behavior was relevant to his propensity to reoffend. He reported that between 2010-2015, Turner's records showed few significant behavioral problems, but said Turner had since showed an increasing pattern of behavioral problems. Dr. Lockhart said Turner's records indicated he had been sent to the hospital 13 times for chest pain during the year 2018, however the tests didn't show any cardiac abnormalities.

Dr. Lockhart said he had considered whether protective factors might mitigate Turner's risk of reoffending. These factors could include advanced age, participation in sex offender treatment, or presence in the community without committing any sex offenses. He concluded Turner didn't possess any protective factors.

Dr. Lockhart concluded Turner posed a high risk of reoffending if released. He had a long history of child molestation, an ongoing sexual interest in children, had not participated sufficiently in sex offender treatment, and lacked an adequate release plan.

13

C. *Dr. Robert Owen's Evaluation of Turner*

Dr. Robert Owen is a clinical psychologist who conducted SVP evaluations of Turner in 2004, 2005, and 2018. Though he agreed Turner met the first two SVP criteria, he opined Turner did *not* meet the third criterion because there was little risk that Turner would reoffend if released.

Dr. Owen testified Turner's age was a significant protective factor in preventing his risk of reoffending. He said it was statistically unlikely for men in Turner's age group to act out sexually, due to the natural decline in testosterone and sex drive as men age. He also pointed to Turner's declining health as a preventative factor. He noted Turner had multiple joint replacements, hip replacements, and multiple cardiac catheterizations.

Dr. Owen discussed a new, large study which found 96 percent of the men studied did not reoffend. The study indicated the instrument commonly used to assess risk of reoffending among sex offenders overestimated the risk by a factor of two. Based on the conclusions of that study, Dr. Owen said, Turner's probability of reoffending would be only 3.4 percent.

D. *The Verdict*

A jury apparently credited the testimony of Dr. Damon and Dr. Lockhart over that of Turner's own expert and found he met the criteria for being designated an SVP to be true. The trial judge ordered Turner committed to a state mental hospital for an indeterminate term.

Turner filed a timely notice of appeal.

# II

# ANALYSIS

A. *Admission of Hearsay Through Expert Testimony*

Turner argues the trial judge erred by allowing Dr. Damon and Dr. Lockhart to relate hearsay evidence to the jury throughout the trial. He argues such testimony was pervasive and prejudicial, and violated the rule stated in *People v. Sanchez*, *supra*, 63 Cal.4th 665 (*Sanchez*) that experts may not relate the contents of case-specific hearsay unless it falls under a hearsay exception or is established through other admissible evidence.

## 1. *SVP Act background*

The SVPA allows for the involuntary civil commitment of sex offenders after they have completed their prison terms if they're found to be sexually violent predators. (*People v. Roberge*, *supra*, 29 Cal.4th at p. 984.) For an offender to be subject to civil commitment, the People must prove beyond a reasonable doubt the offender (1) suffered a conviction for at least one qualifying sexually violent offense, (2) has a diagnosed mental disorder that makes them a danger to the health and safety of others, and (3) the mental disorder makes it likely they will engage in future predatory acts of sexually violent criminal behavior if released from custody. (Welf. & Inst. Code, §§ 6600, 6603, 6604, unlabeled statutory citations refer to this code; *People v. Shazier* (2014) 60 Cal.4th 109, 126.)

"[T]he People may prove the first element—the existence and details underlying the commission of the predicate offense(s)—by introducing documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals." (*People v. Yates* (2018) 25 Cal.App.5th 474, 477 (*Yates*) [cleaned up]; see also § 6600, subd. (a)(3).) "The Act thus contains a broad hearsay exception for the documentary evidence described in the statute as well as for the multiple-level hearsay statements contained in such documents in order to relieve victims of the burden and trauma of testifying about the details of the crimes underlying the prior convictions, which may have occurred many years in the past." (*Yates*, at p. 477 [cleaned up].)

The People may prove the defendant has a diagnosed mental disorder that makes them a danger to the health and safety of others through the testimony of experts. (*Yates*, *supra*, 25 Cal.5th at 477.) "To prove at trial that a defendant suffers from a mental disorder, the People have one or more experts evaluate the defendant to make a diagnosis. A trial court may order an alleged SVP to submit to a mental examination by an expert retained by the People [citation]; however, defendants often refuse to meet with the expert. The diagnosis is therefore frequently based on documentary evidence such as state hospital records, police reports, probation reports, and prison records." (*People v. Roa* (2017) 11 Cal.App.5th 428, 444-445.) "This process may be repeated multiple times over several years in order to satisfy the requirement that, at the time of trial, the person

has 'a currently diagnosed mental disorder.'" (*Yates*, at p. 478; see also § 6600, subd. (a)(3).)

"For the third element, the People must show that, if released, the alleged SVP will likely engage in sexually violent criminal behavior due to the diagnosed mental disorder. [Citations.] The Act requires proof of a clear link between the second and third elements; that is, the finding of future dangerousness must be shown to derive from 'a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior.' [Citations.] Again, in the SVP trial the People will present expert testimony—usually based on diagnostic tools that predict future violent sexual behavior—to establish the alleged SVP's dangerousness and likelihood to reoffend." (*Yates*, *supra*, 25 Cal.5th at p. 478.)

### 2. *Hearsay and People v. Sanchez*

"Hearsay, defined as an out-of-court statement by someone other than the testifying witness offered to prove the truth of the matter stated, is generally inadmissible unless it falls under an exception. [Citations.] Documents like reports, criminal records, hospital records, and memoranda—prepared outside the courtroom and offered for the truth of the information they contain—are usually themselves hearsay and may contain multiple levels of hearsay, each of which is inadmissible unless covered by an exception." (*Yates*, *supra*, 25 Cal.5th at p. 482.)

"The hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez*, *supra*, 63 Cal.4th at p. 676.)

17

Expert witnesses may offer opinions based on any matter, including special knowledge, skill, experience, training, and education, "whether or not admissible, that is of a type that reasonably may be relied upon" by experts in the field. (Evid. Code, § 801, subd. (b).) Until recently, expert witnesses were permitted to relate case-specific hearsay to the jury, as long as the trial judge instructed the jury they could consider the information only for its effect on the expert's opinion, not for its truth. (*Yates*, *supra*, 25 Cal.App.5th at p. 482.)

That changed when the Supreme Court issued its *Sanchez* opinion. That decision "preserved an expert's ability to rely on and cite 'background information accepted in [their] field of expertise,' as well as an expert's ability to rely on and 'tell the jury in *general* terms' that he or she relied upon hearsay evidence." (*Yates*, *supra*, 25 Cal.App,5th at p. 482; see also *Sanchez*, *supra*, 63 Cal.4th at p. 676, 685.) However, the Court determined an expert's recitation of case-specific facts—"those relating to the particular events and participants alleged to have been involved in the case being tried"— must have a firmer foundation because its introduction as support for the expert's opinion necessarily underwrites its truth. (*Yates*, at pp. 482-483.) As a result, the *Sanchez* court held an expert may not relate such case-specific facts to the jury unless they are within the expert's personal knowledge, fall under a hearsay exception, or have been independently established by competent evidence. (*Sanchez*, at pp. 676-677, 686.)

Now, case-specific hearsay an expert relates to the jury as true is not admissible unless a proper foundation has been laid for its admission under an applicable hearsay

exception. "Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez*, *supra*, 63 Cal.4th at p. 684.) Though *Sanchez* is a criminal case, this rule applies to civil cases, including SVP cases. (*People v. Roa*, *supra*, 11 Cal.App.5th 428.) The portion of *Sanchez* addressing the sixth amendment right to confront witnesses against you does not apply because "[t]here is no right to confrontation under the state and federal confrontation clause in civil proceedings." (*People v. Otto* (2001) 26 Cal.4th 200, 214.) However, an SVP defendant does have confrontation rights under the due process clause.[1] (*Ibid*.)

There's no dispute over whether Turner suffered qualifying convictions or has a qualifying diagnosed mental disorder. All three prior child molestation convictions qualify as predicates for treating him as a sexually violent predator. (§ 6600, subd. (b).) And the evidence of those offenses was admissible. Section 6600, subdivision (a)(3), permits the People to establish "[t]he existence of any prior convictions . . . with documentary evidence. The details underlying the commission of an offense that led to a prior conviction, including a predatory relationship with the victim, may be shown by documentary evidence, including, but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of State Hospitals." (See also *People v. Burroughs* (2016) 6 Cal.App.5th 378, 409.) Because the existence and details of the predicate offenses had been independently established by

---

[1] Turner invokes his due process rights, but doesn't argue separately for this as a basis for reversal.

admissible documentary evidence, "the experts were permitted to relate the facts to the jury as the basis of their opinions," consistent with *Sanchez*. (*Burroughs*, at p. 403.)

As for the issue of his qualifying mental disorder, all three experts who testified at his trial—two for the People and one for Turner—diagnosed him with pedophilic disorder. Dr. Lockhart opined that Turner also has antisocial personality disorder, which he believes contributes to Turner's offending behaviors.

The real dispute in this case concerns the evidence that Turner's mental disorder makes it likely he will commit sexually violent predatory offenses if he is released from the state hospital. The People's experts conclude he is likely to reoffend and related to the jury several out-of-court statements that served as the basis for their conclusions. Turner's expert concluded he is not likely to reoffend, primarily because of his age and poor physical health.

### 3. *Turner's admissions about acts of molestation and proximity to youth*

The most damaging evidence against Turner came in the form of his admissions to psychologists that he had committed offenses against numerous children and his descriptions of several incidents. He told at least five psychologists other than the testifying experts that he had molested about 15 children over the years. He also provided factual details about the incidents that were not part of the documentary record. Separately, he admitted to a parole officer he had scouted swimming pools where children congregated so he could swim with them.

Turner argues it was error for the trial court to allow the psychologists who testified to relate the contents of his statements which were contained in psychological evaluations conducted by other psychologists. He identifies as objectionable Dr. Damon's testimony about Turner's statements (i) to Dr. Davis and Dr. McSpeedan admitting he had molested approximately 15 children, (ii) to Dr. Davis and Dr. Clipson about the details of the molestation of two girls in 1991, (iii) to Dr. Davis providing details about eight incidents of uncharged molestation, and (iv) to Dr. Davis and Dr. McSpeedan describing his offense against the girl in Oceanside in the mid-1970s. He also objects that Dr. Damon testified "he had relied on the evaluations of various other doctors in order to perform his risk assessment."

We find these objections to be meritless. In the first place, *Sanchez*, explicitly does not bar an expert witness from *relying* on hearsay evidence. As we've already noted, *Sanchez* reaffirmed an expert's reliance on and citation of background information accepted in their field of expertise, including "to rely on and 'tell the jury in *general* terms' that he or she relied upon hearsay evidence." (*Yates*, *supra*, 25 Cal.App.5th at p. 482; see also *Sanchez*, *supra*, 63 Cal.4th at p. 676, 685.) Thus, Dr. Damon's reliance on the reports of psychologists itself is not a problem. The question is whether he improperly related to the jury the facts Turner related to the other psychologists— especially the number of prior victims, the details of his predation, and his comments about his attraction to children.

Turner also objects to testimony by Dr. Damon and Dr. Lockhart about the reasons his parole was revoked. Dr. Damon told the jury, based on parole officers' reports, that Turner was arrested in November 1998 for felony domestic violence, convicted in March 1999 under Penal Code 273.5, and sentenced to seven years in prison.[2] He said Turner was paroled in June 2004, but his parole was revoked twice, first in March 2005 for repeatedly missing required sex offender treatment, and again in August 2005 for frequenting areas where children gather.

Both Dr. Damon and Dr. Lockhart related to the jury statements Turner made to his parole agent after the second violation. According to Dr. Damon, the agent said Turner told her "He saw a pool with kids. He went home and got his swim trunks, and he returned and went to the pool with the children, and he said that he did that two days in a row. He said that he knew he was wrong, but he was hot, and he told her that he needed more treatment than just three days a week, that he needed it daily because of his thoughts." Dr. Lockhart reported the same facts.

We conclude Dr. Damon and Dr. Lockhart were permitted to relate the statements Turner made to his psychologists and to the parole officer under the hearsay exception for party admissions. "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his

---

[2] Turner objects to Dr. Damon's testimony about his nonqualifying offenses—his misdemeanor conviction for annoying or molesting a child in 1976 and his felony spousal abuse conviction in 1998. However, the details of the 1976 offense came in as Turner's admissions to Dr. Damon and others. And Dr. Damon did not testify regarding any details about the spousal abuse incident, limiting himself to the fact that he had been convicted and incarcerated for spousal abuse.

individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity." (Evid. Code, § 1220.) An "admission" is a statement made by a party relevant to any fact in dispute. (*Legg v. United Beneficial Life Ins. Co.* (1951) 103 Cal.App.2d 228, 229; *People v. Panky* (1978) 82 Cal.App.3d 772, 777.)

Here, Turner admitted committing numerous acts of child molestation to five nontestifying psychologists who had evaluated him previously. He also admitted to scouting areas that would allow him access to children while on parole. The prior offenses and the acts that show continuing interest in children are undoubtedly relevant to the question whether Turner poses an ongoing risk to the public if he's released. Dr. Damon and Dr. Lockhart both testified to that effect. Since Turner is a party to this SVP proceeding, his prior statements are admissible under the exception to the hearsay rule for party admissions. (*Yates*, *supra*, 25 Cal.App.5th at p. 485; see also *People v. Monreal* (1997) 52 Cal.App.4th 670, 676 [holding "probation report . . . contain[ed] admissions by defendant to the probation officer about the circumstances of the offense. Such a statement qualifies as admissible hearsay under Evidence Code section 1220"], disapproved on other grounds by *People v. Trujillo* (2006) 40 Cal.4th 165, 178-179.)

It's also notable that Turner also told Dr. Damon and Dr. Lockhart several of the same details in his interviews with them. Dr. Lockhart interviewed Turner about the parole revocation, and Turner confirmed he visited swimming pools and did so in part to gratify his sexual interest in children. Turner described to Dr. Damon his molestation of a

girl in Oceanside in the mid-1970s, including that he had touched her buttocks under her clothes and "played doctor" by touching her vagina and buttocks skin to skin.

We conclude the trial judge did not err by permitting Dr. Damon and Dr. Lockhart to convey to the jury the contents of Turner's own statements about the prior incidents of child molestation and more recent acts of scouting behavior.

Turner objects most strongly to Dr. Lockhart's testimony that Turner told another psychologist that he had molested between 15 and 30 children, which is a much higher estimate of the number of his victims. However, the inconsistency is relevant to the weight the jury should accord the evidence, not whether his admission falls under an exception to the hearsay rule and could be related to the jury.

### 4. *Evidence of disciplinary incidents and incidents of malingering*

Turner also objects to Dr. Damon's testimony relating facts about his conduct in the state hospital, which were contained in various treatment and disciplinary notes kept by hospital staff members. The trial judge ruled these records fell under the business records exception to the hearsay rule, so Dr. Damon was permitted to relate their contents to the jury.

Dr. Damon said Turner's records included treatment notes by hospital staff describing hostile altercations involving Turner. One note said Turner "was yelling at a peer. A staff member heard him and told him to stop and think about what he was doing, and [Turner] became verbally aggressive." "He said, Fuck you. And the staff member held out his or her hand to get Mr. Turner's ID, and Mr. Turner hit the staff member's

24

hand, and the staff member said that was being assaultive. And then he threw the ID at the person, and I think it hit the staff member's leg or something like that." Another note said Tuner was trying to find a staff member who would do something for him and went from staff member to staff member when he received a negative response. When a staff member told him to stop "staff shopping," he cursed at them. On a third occasion, another patient asked hospital staff to help get Turner out of his room because he feared Turner would steal something. When the staff member intervened, Turner shouted, "I can be anywhere I fucking want. You cannot tell me where the fuck I can be."

Turner also objects to Dr. Damon's testimony relating facts about his apparent malingering based on further incident reports. A report from 2015 indicated Turner complained of chest pains and was taken to a medical facility, where he received an EKG with a normal result. This conduct represented a pattern for Turner. Damon said the incident reports showed he had made similar complaints 14 times in 2017 and 12 times in 2018. Dr. Damon said a physician's note on one of these occasions indicated the doctor told Turner he thought he was "crying wolf," and Turner had agreed. Ultimately, Dr. Damon said he came to the same conclusion and said he didn't find evidence Turner's medical problems which would prevent him from reoffending.

The business records exception to the hearsay rule permits admission of hearsay if the proponent establishes certain foundation requirements, namely that "(a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness

25

testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1271; see also *People v. Zavala* (2013) 216 Cal.App.4th 242, 246.)

Documents like hospital records often are deemed admissible as business records when a custodian of records or other qualified witness provides proper authentication to meet the foundational requirements of the hearsay exception. (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1280.) Compliance with a subpoena duces tecum may dispense with the need for a live witness if the records are produced by the custodian or other qualified witness along with an affidavit as described in Evidence Code section 1561. (Evid. Code, § 1560, subd. (b); *In re R.R.*, at p. 1280.) The affidavit must include "[a] description of the mode of preparation of the records" and a statement that "[t]he affiant is the duly authorized custodian of the records or other qualified witness and has authority to certify the records" and "[t]he records were prepared by the personnel of the business in the ordinary course of business at or near the time of the act, condition, or event." (Evid. Code, § 1561, subd. (a)(1), (3), (5).) The trial judge has broad discretion to determine whether a party has laid a proper foundation for admission of business records, and we won't disturb an exercise of such discretion absent a showing of abuse. (*Zavala*, *supra*, 216 Cal.App.4th at pp. 245-246.)

As the People argue, unlike in the *Yates* and *Roa* cases Turner relies on, in this case the prosecution *did* put the documentary record into evidence. (See *People v. Roa*, *supra*, 11 Cal.App.5th at p. 452 ["The experts in this case testified extensively about case-specific facts they obtained from the investigator's reports . . . [However, the] reports themselves were not admitted into evidence" so admitting "expert testimony relating case-specific facts about these incidents was error"].) The documents the experts relied on and related to the jury in this case *were* part of the record. Indeed, many of the key documents were admissible under section section 6600, subdivision (a), regardless of the hearsay rule, for the purpose of establishing the predicate offenses. It's for this reason, presumably, Turner does not argue the People failed to establish his qualifying convictions. But the same records aren't necessarily admissible to prove Turner is likely to offend again if released. To use the documents for that purpose, and for the prosecution experts to relate their contents to the jury, the People were required to establish that a hearsay exception applied.

Here, they attempted to establish the documents qualified as business records under the terms of an agreement between the district attorney's office and the public defender's office. According to the prosecution, this agreement sought to dispense with litigation over the foundation for certain records in all their SVP cases on a global basis. "[T]he People do have a global stipulation with Public Defender's office as to business and official records under 1271 and the official records provisions, which I cannot recall off the top of my heard at the moment. So regardless of—of any custodians of records

declarations, we have a global stipulation that we've been offering under—as a common understanding for quite some time."

But the terms of the stipulation were not introduced to the court, and it's not clear what the stipulation purported to establish. Before trial, the prosecutor represented that the stipulation "establishes the authentication with regard to the documents themselves, but beyond that [cross-talk] we have to—each side has to establish a hearsay [cross-talk] exception with regard to whatever comes in from the records that is a statement." It appears from defense counsel's comments that he believed the stipulation established the documents were authentic, not that they qualified as business records. And defense counsel objected the documents couldn't come in as evidence without a custodian of records declaration. The parties didn't resolve that question satisfactorily at trial. As a result, we are concerned that the trial judge did not have an adequate basis for deciding the hospital and medical records at issue here qualify as business records. However, we're also concerned Turner has not adequately raised and argued for excluding the documents, since he focuses almost exclusively on reasons for excluding Dr. Damon's testimony and has not raised the problems with the purported stipulation as a separate basis for overturning the trial judge's ruling.

In any event, we need not decide whether the trial judge erred by allowing the psychologists to relay the content of the hospital records to the jury. As we've noted, many of the key documents in this case were admissible under section 6600, subdivision (a), regardless of the hearsay rule, to establish the predicate offenses. And as we've

28

discussed in part II.A.3. *ante*, nearly all of the most damning evidence related to the likelihood Turner would reoffend came in the form of Turner's own admissions to the psychologists or the parole officer. The information the psychologists related from the hospital records is of peripheral importance—meaning the testimony was not prejudicial.

We reverse the admission of expert testimony in violation of *Sanchez* only if it is reasonably probable the jury would have returned a verdict more favorable to Turner. (*People v. Roa*, *supra*, 11 Cal.App.5th at p. 455.) Though the prosecution used the evidence about Turner's altercations with staff and other patients to demonstrate his propensity to reoffend, it was of minor importance placed beside the remaining overwhelming evidence. Dr. Damon explained noncompliance with supervision is just one risk factor in reoffending. He said he concluded Turner was likely to reoffend because of the "specialization of his offending, the persistence of his offending, the age of onset of his offending," and the fact he is an above-average risk offender at his age using the standard diagnostic tool. Dr. Damon also emphasized Turner's high number of victims, his high-risk behavior while on supervised release, his history of reoffending, and his failure to reduce his risk through treatment. Indeed, Turner's own psychologist acknowledged the seriousness of his history, and admitted Turner had engaged in high-risk conduct while on parole just months after he previously opined Turner was not likely to reoffend.

We therefore conclude any error in allowing the psychologists to relate the contents of the hospital records relating to his altercations and medical condition was harmless.[3] (See *People v. Flint* (2018) 22 Cal.App.5th 983, 1002-1006.)

B. *Judicial Misconduct Through Commentary on Objections*

Turner argues the trial judge committed misconduct by repeatedly commenting that his attorney's objections were futile. He argues this is a case where "the trial court persists in making discourteous and disparaging remarks to the defendant's counsel" that "it has transcended so far beyond the pale of judicial fairness as to render a new trial necessary." (*People v. Mahoney* (1927) 201 Cal. 618, 626-627.)

Turner's attorney repeatedly objected to the testimony of the People's experts on the grounds discussed in part II.A., *ante*. "No matter the objection, the court repeatedly overruled defense objections, and characterized further objection as 'futile.'" Turner sets out 25 examples of such exchanges at length in his opening brief. One will suffice to give the flavor. The prosecutor asked one expert, "Did [Turner] tell Dr. Davis in 2004 about a child molestation in the mid 70s?" Defense counsel interjected, "And just for the record, I'm going to renew my in limine objections." The court responded, "And I'll . . . overrule them and note that further objection would be futile." Defense counsel responded, "Thank you."

---

[3] Turner lists as problematic the psychologists' use of the risk assessment tool (Static 99-R). However, he doesn't adequately explain the objection, and we therefore deem it waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; Cal. Rules of Court, rule 8.204(a)(1)(B).)

On appeal, Turner leaves out the fact that his trial counsel requested that the trial judge note further objection would be futile and the trial judge's comments merely complied with that request. He also omits the fact that trial counsel thanked the trial judge for the ruling on almost every occasion. The reason is clear. As Turner acknowledges in attempting to justify his failure to object at trial to the judicial misconduct, counsel normally must object to a trial error to preserve the issue for appeal. However, an appellate court may consider errors if objection would have been futile. (See *People v. Boyette* (2002) 29 Cal.4th 381, 432, [timely objection not required to preserve issue for appeal if objection would have been futile].)

It's for that reason that defense counsel asked the trial judge to note that repeating the objection each time the issue arose at trial wasn't necessary after the trial judge initially ruled on the objections before trial. "I will try to . . . make a brief record when [cross-talk] come in, but just would the Court order that my objections under [the] Fifth and Sixth amendments, *Sanchez* due process be held against . . . any of my client's statements that are introduced under this guise without any further objection?" The trial judge responded, "I will order that those objections are continuing, and that further expression of the objections would be futile, but that they are noted as to all the statements, that, for the record, the defense counsel does object strenuously to those statements [cross-talk] at trial." Trial counsel was taking out an insurance policy in case he neglected to object at some later point. By reiterating the futility, the trial judge was endorsing the policy, not commenting on trial counsel's ability or choices.

We conclude these comments, which were uniformly civil and made for the benefit of defendant at defense counsel's request, were not discourteous or disparaging in the least, and therefore that there was no judicial misconduct.

## III

## DISPOSITION

We affirm the verdict.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

MILLER
J.