Filed 8/29/23  P. v. R.M. CA1/3
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.M.,<br><br>        Defendant and Appellant. | A165171<br><br>(San Mateo County<br>Super. Ct. No. SC044388A) |

Defendant R.M. appeals from a trial court order extending his civil commitment under Penal Code section 1026.5.[1]  He contends:  (1) there is insufficient evidence to support the finding that he has serious difficulty controlling his dangerous behavior and poses a substantial risk of physical harm to others; and (2) the court improperly admitted evidence under the business records exception to the hearsay rule.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was committed in 1999 after being found not guilty by reason of insanity of residential burglary (§ 460, subd. (a)).  He admitted that the victim of the offense was 65 years of age or older (§ 667.9, subd. (a)) and that the crime was a " 'serious felony' " (§ 1192.7, subd. (c)(18)).  In short, the

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

offense involved defendant breaking into his father's home, beating his father, and fracturing his father's skull in multiple places. Defendant, who first experienced psychotic symptoms and was diagnosed with schizophrenia in his early twenties, attacked his father while experiencing delusions and hallucinations: he believed his father was the Devil, and he heard God commanding him to hit his father. Over the years, the court extended the commitment several times.

In June 2021, the People filed a petition to extend the commitment pursuant to section 1026.5. On April 1, 2022, after a bench trial, the court found beyond a reasonable doubt that defendant has a mental disease, defect, or disorder that causes him to have serious difficulty controlling his dangerous behavior and to pose a substantial danger of physical harm to others. The court ordered the commitment extended to November 10, 2023. The following is a summary of the trial evidence.

Dr. Muhammad Tariq, a licensed psychiatrist at Napa State Hospital who has served as defendant's treating psychiatrist since mid-2020, testified that defendant lives with schizophrenia and his symptoms include delusions and hallucinations. Although defendant has not had hallucinations since at least mid-2020, he maintains an ongoing fixed delusion that he is an inventor whose inventions include producing limitless energy and traveling to the moon in 90 minutes. Dr. Tariq has not observed defendant make threats or act out in violence because of his delusions. But when Dr. Tariq tries to "reality test" the inventions, defendant gets angry and agitated and can become verbally abusive unless the questioning stops.

Dr. Tariq also testified that defendant denies he has delusions and thinks he has been in remission for over a decade. Defendant is currently on a "maximum dose" of Seroquel, an antipsychotic medication. Although

2

medication compliant, defendant has resisted attempts to adjust his medication because he believes it already controls all of his symptoms. Defendant admitted he has not recently participated in "core groups" meant to address a patient's illness and discharge preparation, which is part of his treatment plan.

In terms of discharge, defendant's plan is to get released through the appeal process, then support himself with money he has saved and by working and selling his inventions. Defendant believes his family will support him, but Dr. Tariq is aware of only one brother who has participated in any of defendant's treatment at the hospital. Defendant consistently disclaims any intention to discharge through CONREP, an outpatient program that could assist him with medication compliance, participation in groups or psychiatric appointments, and compliance with other rules while in the community.

Dr. Lindsey Alvis is a licensed forensic psychologist who was previously employed at Napa State Hospital and whom the trial court designated as an expert in forensic psychology, diagnosis of mental illness, and risk assessments. Dr. Alvis testified that she interviewed defendant in June 2021 but was unable to thoroughly assess him because he immediately took control of the interview and was unwilling to discuss various important topics such as his commitment offense, diagnosis, and symptoms. When she asked about CONREP, defendant "rapidly escalated and became agitated and jumped out of his chair." This response was "rather intimidating" and "somewhat threatening," as defendant was a few feet from her in a small room.

After reviewing defendant's medical records and hearing Dr. Tariq's testimony, Dr. Alvis concluded that defendant has chronic schizophrenia and experiences delusions. Dr. Alvis also testified that defendant's medical

records showed the following. He denied being symptomatic for the last decade and does not believe he needs medication to manage his symptoms. Defendant was unable to form a therapeutic bond or rapport with his current treatment team, and he blamed his medication for the commitment offense. He refuses group treatment in favor of pursuing his inventions, and he exhibits emotional instability, particularly when his focus is turned from his inventions toward treatment.

In Dr. Alvis's opinion, it is concerning that defendant lacks insight into his mental illness and does not understand the need for ongoing treatment. Though defendant had not been violent or medication noncompliant in the state hospital, Dr. Alvis noted defendant's belief that he was required to take medication only because of an involuntary medication order.

Dr. Alvis found defendant's unwillingness to be discharged into CONREP significant in light of defendant's history of medication noncompliance prior to the commitment offense and his continued lack insight of into his mental illness, history of violence, and need for treatment. Dr. Alvis believed CONREP would provide important support outside of the hospital, help maintain treatment engagement and medication compliance, and prevent decompensation.

Using the "HRC-20" test, Dr. Alvis ranked defendant a moderate risk of future harm in the community without the support of CONREP, a low/moderate risk for imminent violence without CONREP, and a moderate risk of substantial harm to others in the community without CONREP. Defendant poses a lower risk of violence in the state hospital because it is a controlled environment where staff constantly monitor patients, provide medications, and are trained in de-escalation of patients. Dr. Alvis believed it likely that defendant would become medication noncompliant while

4

unsupervised in the community, which would increase his risk of heightened agitation and hallucinations. And because defendant has "poor frustration tolerance" and "easily escalates to a level of agitation" when challenged, Dr. Alvis expressed concern that, outside of the hospital setting, defendant might become violent if rebuffed when attempting to approach someone about his inventions. For all these reasons, Dr. Alvis opined that defendant has serious difficulty controlling his dangerous behavior and poses a substantial risk of physical harm to others due to his mental illness.

Defendant testified on his own behalf. He acknowledged he has had schizophrenia since his early twenties and was delusional and hallucinating at the time of his commitment offense. The attack occurred after he was recently released from an involuntary commitment at Cordilleras Mental Health Facility and was living at "Jackson House," a board and care home with a supportive environment for people with mental illnesses. He denied intentionally being off his medication at the time of the commitment offense, though he may have told Dr. Tariq he missed a dose of his medication prior to that offense and may have testified in 2020 that he chose to go off of his medication in the past. Even though defendant did not want to take medication when he "first went into mental health," he now understands its importance. Defendant said he intends to take his medication if discharged and believes he needs the medications to manage his symptoms.

As for his discharge plans, defendant acknowledged he has never gone into outpatient treatment and is unwilling to work with CONREP, in large part because a person going into CONREP cannot enter into business contracts. Instead, he has saved about $7,000 in cash and can claim a $6,000 inheritance upon release, and he plans to live alone. Defendant has been looking into renting a room in North Beach for $995 and intends to pay first

5

and last months' rent plus a deposit. He will supplement his income by working and selling his inventions, and he plans to contact and personally meet with people such as Elon Musk and Bill Gates to either sell his inventions or form his own company.

Once he is in the community, defendant plans to apply for emergency MediCal and use public transit. If he runs out of medications and begins hallucinating, he will seek out emergency assistance and would not act on hallucinations. Consistent with the expert testimony, defendant denied having any symptoms of mental illness for the last ten years, including delusions. He acknowledged he declined Dr. Tariq's attempts to adjust his medication despite being told his current medication is ineffective in treating his delusions.

Defendant emphasized he never committed any acts of violence during his 23 years in the hospital, even though he claimed to have been attacked by others. With regard to participation in treatment groups, he claimed that for "five years," from "2017, maybe 2015 to '19 or '20," he did "core programs" with a 90 percent attendance rate or more. He stopped after he was moved to a different unit because he was unwilling to work with CONREP. When asked to clarify which time periods he had a 90 percent participation rate in core groups, he could not provide a clear answer.

Defendant's brother also testified. The brother said he is willing to help defendant transition back into the community in ways that he can—e.g., pick him up from the hospital upon discharge, help him get to the doctor, and help him find housing. But the brother was unwilling to have defendant live with him or to manage defendant's medications on a daily basis. He has no experience working with people having mental illnesses and does not know what defendant's symptoms are aside from hallucinations. He indicated he

6

encouraged defendant to participate in CONREP and treatment groups but was unsure if he was successful.

## DISCUSSION

### A. Sufficiency of the Evidence

The commitment of a defendant found not guilty by reason of insanity can be extended "only if the person has been committed under Section 1026 for a felony and by reason of a mental disease, defect, or disorder [he or she] represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1).) Extension of such a commitment requires proof that the defendant has "serious difficulty controlling his dangerous behavior." (*People v. Williams* (2015) 242 Cal.App.4th 861, 872 (*Williams*).) "[A] release under section 1026.5 is an unconditional one—the released person leaves the psychiatric facility without further supervision or compulsory treatment." (*People v. Bolden* (1990) 217 Cal.App.3d 1591, 1599 (*Bolden*).)

" ' "In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt." ' " (*People v. Bowers* (2006) 145 Cal.App.4th 870, 878–879.) "It is not our function to reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts, as these are functions reserved for the trier of fact." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955 (*Tripp*).) "A single psychiatric opinion that a person is dangerous because of a mental disorder constitutes substantial evidence to justify the extension of commitment." (*Williams, supra,* 242 Cal.App.4th at p. 872.) Reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient

7

substantial evidence to support' " the verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, defendant does not challenge the trial court's determination that he has a mental disorder—schizophrenia. He also accepts the court's finding that he experiences ongoing delusions "centering on his identity as an inventor and the viability of his scientific inventions." We accept these concessions and note the testimony of Drs. Tariq and Alvis amply supports them.

Beyond the foregoing, defendant argues there is no substantial evidence supporting the finding that he has serious difficulty controlling his dangerous behavior and poses a substantial danger of physical harm to others. We disagree.

It is undisputed the commitment offense involved defendant's violent attack on his father while hallucinating that his father was the Devil and that God commanded the attack. And as fully recounted above, Dr. Alvis opined, as an expert in forensic psychology, diagnosis of mental illness, and risk assessments, that defendant has serious difficulty controlling his dangerous behavior and that he poses a substantial risk of physical harm to others due to his mental illness. Dr. Alvis indicated her opinion was based on his commitment offense,[2] his failure to understand or accept his mental illness or recognize his symptoms, his failure to understand his need for long-term treatment "including with a therapeutic level of medication that would actually potentially have an impact" on his ongoing symptoms, and his

---

[2] Defendant takes issue with Dr. Alvis using the phrase "history of violence" in referring to the commitment offense, arguing the word "history" has a misleading connotation of repetitive acts. But there is no indication that her use of the term had any negative or improper impact on her opinion or the trial court's ultimate ruling.

inability to control his emotional and behavioral responses to frustrations, including challenges to his delusions. Substantial evidence supports the bases for the doctor's opinion, which is a reasonable one drawn from the evidence, not one based on mere surmise or conjecture.

Moreover, the evidence of defendant's lack of insight into his mental illness substantially supports the finding that he poses a substantial risk of physical harm to others. Defendant currently experiences delusions, though he denies having had any symptoms of mental illness for the last ten years. As a result, he does not believe he needs medication to manage any ongoing symptoms. Not only has defendant refused Dr. Tariq's recommendation to adjust his medication to treat ongoing symptoms, but the evidence reflects that defendant makes treatment decisions based on his delusion that he is a creator of certain inventions of immense significance. Specifically, he declines to attend core treatment groups and declines to consider discharge into CONREP so that he can enter business contracts for his inventions.

Dr. Alvis opined defendant's failure to participate in ongoing treatment reflects a lack of insight into his need for medication and treatment, which makes him a high risk for medication noncompliance in the community. Though defendant's brother expressed willingness to help defendant in the community in ways that he can, the brother declined to manage defendant's medications on a daily basis. Indeed, the brother lives in Santa Cruz while defendant tentatively plans to reside alone in San Francisco, and the brother's attempts to encourage defendant's participation in CONREP and treatment groups in the hospital have already failed, casting serious doubt on the prospect of a different outcome in the community.

Other evidence likewise bolstered Dr. Alvis's opinion that defendant is a high risk of medication noncompliance in the community. For example, Dr.

9

Sabeen Kaka's February 2021 quarterly note recorded that "[defendant] reports that it is because of medication that all this (his offense) happened. It was a medication problem from the beginning. He states he 'did nothing to deserve this . . . I was walking in my sleep' in reference to the violence he engaged in for his [commitment] offense." While defendant contests the admissibility of a similar statement recorded in a May 2021 quarterly note, he does not contest the admissibility of the statements recorded in this February 2021 note which, as we will discuss *post*, appear admissible as a party admission or state of mind evidence (Evid. Code, §§ 1220, 1250).

As defendant acknowledges, medication compliance is highly relevant to the determination of future dangerousness. (See, e.g., *Bolden*, *supra*, 217 Cal.App.4th at p. 1600.) Here, Dr. Alvis testified that without medication, defendant's hallucinations may return and he may act on them. Dr. Alvis also testified that without medication there is an increased risk defendant will exhibit heightened agitation beyond his current levels of agitation.

On this latter point, there is evidence of numerous recent incidents in the hospital in which defendant demonstrated emotional instability. As recounted above, Dr. Alvis personally experienced one such episode when defendant refused to discuss topics such as his commitment offense, diagnosis, and symptoms during an interview, then became intimidating and threatening as he "rapidly escalated and became agitated and jumped out of his chair" when asked about CONREP. Dr. Tariq testified, in a similar vein, that when he has tried to "reality test" defendant's inventions, defendant gets angry and agitated and can become verbally abusive. The agitation defendant displays in the hospital was concerning to Dr. Alvis, who noted that defendant's medication—which Dr. Tariq referred to as a "maximum dose" of Seroquel—has a sedating effect. On this record, substantial evidence

supports the court's finding that defendant has serious difficulty controlling his dangerous behavior and poses a substantial danger of physical harm to others.

Defendant's contentions to the contrary are unpersuasive. Defendant argues there is no evidence he "intentionally" went off his medication around the time of the commitment offense, and he acknowledges his previous testimony that he may have missed a dose unintentionally at Jackson House. Even if true, this does not assist defendant: it merely highlights the fact that he could become medication noncompliant and violent despite living in a supportive environment like Jackson House that dispenses medications, and despite being recently released from an involuntary commitment at Cordilleras Mental Health Facility, where he was medicated.

Defendant also contends it was undisputed he has been medication compliant during his commitment. He further argues there was no admissible evidence that he ever stated he did not want to take his medication or would stop if released and no evidence that he ever tried to evade medications. While these may be fair points in defendant's favor, we reject the argument because it merely invites us to reweigh the evidence. (*Tripp, supra,* 151 Cal.App.4th at p. 955.)

Defendant argues his delusion that he is a great inventor is not substantially likely to result in physical harm to others because there was no evidence that the delusion has resulted in violence or threats of violence or that it involved dangerous or violent thoughts. While the absence of such evidence was important for the trial court to consider, the court heard a lot of evidence bearing on defendant's dangerousness, which we cannot reweigh.

Relying on *People v. Cheatham* (2022) 82 Cal.App.5th 782 (*Cheatham*) and *People v. Redus* (2020) 54 Cal.App.5th 998 (*Redus*), defendant contends a

11

person need not be free of all symptoms of mental illness to be discharged under section 1026.5.  We take no issue with that general proposition, but the principal question is whether a person, "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1); see, e.g., *Cheatham*, at p. 790.)  For the reasons below, the instant case presents no parallel to *Cheatham* and *Redus*.

*Cheatham* involved an appellant who was found not guilty by reason of insanity after he fled or attempted to flee from criminal custody because he heard nonexistent voices telling him he was in danger.  (*Cheatham*, *supra*, 82 Cal.App.5th at pp. 785–786.)  Significantly, the appellant had *never* engaged in *any* dangerous behavior, and there was no evidence he had "*ever* committed a single violent, aggressive, or threatening act that was attributable to his mental disorder."  (*Id.* at pp. 790, 794.)  On those facts, the Court of Appeal reversed the commitment extension even though there was evidence the appellant would not be medication and treatment compliant if released and his mental health symptoms would increase.  (*Id.* at p. 790.)

*Redus* involved an appellant who was 73 years old and described by a psychology and risk assessment defense expert as a " 'fragile old man' " who was not "physically capable of taking action against an object of his paranoia even if he wanted to."  (*Redus*, *supra*, 54 Cal.App.5th at p. 1011.)  The appellant had not committed any violent act during his 45 years of commitment, and there had been no "hint of violence, threatening behavior, or aggressiveness *of any kind* on the part of appellant over multiple decades, *even through CONREP releases and medication lapses*."  (*Id.* at p. 1012, italics added.)  The defense expert had also opined that the appellant "would be motivated to continue taking his medications because he did not want to spend his last days in the hospital" and that such opinion "was bolstered by

12

evidence that, upon his release, appellant's daughter, a retired deputy sheriff, testified that she was prepared to offer him a home with her and to supervise his monthly medication injections and other medical appointments." (*Id*. at p. 1013, fn. 4.) Based on this record, *Redus* found substantial evidence did not support the trial court's finding that the appellant's mental illness caused him serious difficulty controlling his potentially dangerous behavior. (*Id*. at p. 1013.)

Unlike the situations in *Cheatham* and *Redus*, the record here contains substantial evidence that defendant poses "a substantial danger of physical harm to others" due to his mental health issues. As discussed, his commitment offense involved hallucinations that drove him to violence, and he has exhibited emotionally unstable and verbally abusive behavior in the hospital. Defendant refuses to engage in outpatient treatment via CONREP, so there is no basis for evaluating his behavior in an outpatient setting. Likewise, there appears no likelihood of support or treatment supervision upon defendant's release, which in turn makes him a high risk for medication noncompliance and potential dangerousness in the community.

Last, defendant argues his refusal to participate in group treatment or to work with CONREP is not substantial evidence of dangerousness because his refusal is unconnected to dangerous behavior. This misses the point, which is that the reasons for his refusal demonstrate he is making significant decisions based on ongoing symptoms of his illness and delusions that he fails to acknowledge and declines to treat.

In sum, substantial evidence supports the trial court's finding beyond a reasonable doubt that defendant has serious difficulty controlling his dangerous behavior and that he poses a substantial danger of physical harm to others.

13

**B. Alleged Evidentiary Errors**

Next, we address defendant's contention that the trial court wrongly admitted medical records under the business records exception to the hearsay rule.  (Evid. Code, § 1271.)

*1. Additional Factual Background*

Prior to trial, defendant filed motions in limine arguing state hospital records should not be admitted as business records and experts should not be permitted to testify to case specific hearsay in violation of *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  Before the presentation of evidence, the People sought to introduce 25 pages of excerpts from 2,000 to 3,000 pages worth of defendant's medical records.  Because these pages were just excerpts, the People sought to assist the court and counsel by creating a table showing information about each excerpt, such as its date, author, and pertinent statements defendant made.  The table and the 25 excerpts were designated collectively as People's Exhibit 1 (hereafter "Exhibit 1").

Defense counsel orally objected, arguing generally that some of the excerpts contained hearsay since they were from reports made by clinicians or staff describing things defendant said or did.  He also contended that some portions did not qualify as business records because they were not made in the normal course of business.  Defense counsel further objected to any reports dating back to 2018 or 2019, arguing they were irrelevant given their remoteness.

The trial court denied defendant's motion to exclude the documents, finding that they qualified as business records and that certain hearsay exceptions applied, such as for a party admission or for a person's state of mind.  The court also noted that hearsay exceptions could apply to multiple levels of hearsay within a document.  (See *Sanchez*, *supra*, 63 Cal.4th at

pp. 674–675.)  Thereafter, defense counsel stipulated that the People's table summarizing information about the documents was accurate.  After trial, the court indicated in its oral ruling that it considered the documents in Exhibit 1.

### 2. Analysis

First, defendant claims the People's table—which summarized some information concerning the excerpted records—referenced two documents not actually included in Exhibit 1 and so should have been excluded.  Setting aside defendant's apparent forfeiture of the issue, we agree with the People that any conceivable error in admitting the table was harmless.  Generally, state law error in admitting evidence is subject to the standard for harmless error set out in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Flint* (2018) 22 Cal.App.5th 983, 1003 [erroneous admission of expert testimony containing inadmissible case-specific hearsay statements is reviewed under *Watson*].)  Here, the table merely summarized information about the excerpted documents.

Second, defendant acknowledges portions of the medical records in Exhibit 1 were admissible, but argues some portions were inadmissible and should have been redacted, namely:  (1) summaries, opinions and conclusions concerning his symptoms, medication effectiveness, group participation, relationship with treatment providers, behavior, and progress on discharge goals; (2) information from prior records, such as a CONREP report and prior risk assessments; (3) information about his past history where the source is not clearly identified; and (4) statements attributed to defendant without the source of information or date.

He also argues the erroneous admission of the entirety of Exhibit 1 allowed Dr. Alvis to testify about the following case-specific hearsay:  (1) the

15

May 11, 2021 quarterly psychology progress note by Dr. Kaka stating defendant blamed medication for his commitment offense; (2) the May 10, 2021 clinical social work progress note by Senaida Rangel stating defendant "verbalizes" he does not need medication to manage his symptoms; (3) a December 10, 2019 quarterly psychology progress note by Dr. Kimberly Klem stating defendant denied experiencing psychiatric symptoms; and (4) a June 3, 2020 quarterly conference note by Dr. Kaka stating defendant had been unable to form a therapeutic bond with treatment members. The People acknowledge portions of Exhibit 1 were inadmissible, but argue any error was harmless. We agree with the People.

Defendant argues the error was prejudicial because inadmissible portions of the exhibit supported key aspects of the People's case, namely, the People's theory that defendant blamed medication for the instant offense. Specifically, defendant cites Dr. Kaka's May 11, 2021 quarterly psychology progress note, which included a purported statement by defendant on this point. Defendant claims this statement was inadmissible because the note did not identify the source of the information, and aside from this, there was not a "single verifiable occurrence of [defendant] stating that he blamed medication for the offense." This, however, is inaccurate.

Our review discloses at least two other times doctors reported defendant's statements on the topic, without objection from defendant. Dr. Kaka's February 16, 2021 quarterly conference note included defendant's statements that "it is because of medication that all this (his offense) happened. It was a medication problem from the beginning. He states he 'did nothing to deserve this . . . I was walking in my sleep' in reference to the violence he engaged in for his [commitment] offense." These particular statements appear admissible as a statement of defendant's existing mental

16

or physical state (Evid. Code, § 1250, subd. (a)) or perhaps as a party admission of his actions or thoughts (Evid. Code, § 1220). In addressing the February 16, 2021 quarterly conference note, defendant concedes his direct statements at the conference were admissible.

Additionally, a June 2020 note by Dr. Tariq documented a face-to-face meeting with defendant in which defendant made the following statements about his commitment offense: defendant had been "in and out of hospitals"; "his medications were being constantly changed and the medications were ineffective"; and "he was compliant with the medications and just missed one dose prior to his instant offense." Again, these statements appear admissible under the party admission and state of mind exceptions to hearsay, and defendant concedes Dr. Tariq's description of this interaction was admissible. Given such evidence, it is not reasonably probable the verdict would have been more favorable to defendant had the court redacted the challenged statement in Dr. Kaka's May 2021 note.

Defendant also argues the inadmissible portions of Exhibit 1 supported another key prosecution theory, i.e., that defendant would stop taking medication if discharged. For this argument, defendant cites the People's reference to a nonspecific and undetailed May 10, 2021 social work progress note by Senaida Rangel referring to defendant's verbalization that "he does not need medication to manage his symptoms."

Again, assuming this was not a record of an actual statement by defendant, there is no reasonable probability of a different outcome had Rangel's note been redacted. Though Dr. Alvis relied on the note as evidence that defendant lacks insight, there was plenty of other evidence on this topic, including the testimony of Dr. Tariq and defendant himself.

17

For similar reasons we conclude it is not reasonably probable the outcome would have been different had Dr. Alvis not testified about the challenged portions of Dr. Kaka's May 11, 2021 quarterly psychology progress note and Rangel's May 10, 2021 note. Nor is it reasonably probable the outcome would have been different had Dr. Alvis not testified about a December 10, 2019 quarterly psychology progress note stating that defendant denied experiencing psychiatric symptoms or about a June 3, 2020 quarterly conference note stating that defendant had not been able to form a therapeutic bond with treatment members. Defendant himself testified he has not experienced any symptoms of mental illness in the last ten years and Dr. Tariq testified defendant said his symptoms have been in remission for more than 10 years. Moreover, whether defendant formed a therapeutic bond with treatment members is largely irrelevant, and the record was replete with evidence that defendant refused to attend core treatment groups.

Finally, defendant makes a general claim of prejudicial error due to the People's reliance on Exhibit 1 and the court's having reviewed it. We are not persuaded. Defendant shows no reasonable probability of a more favorable outcome had the exhibit been further redacted.

In sum, reversal is not warranted due to perceived evidentiary error.

### DISPOSITION

The order extending defendant's commitment is affirmed.

18

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.


*People v. R.M* (A165171)

19